Judge Green.
This was an action by the appellants against the appellee, for sundry slaves. Upon the trial of the .issue of non detinet, the plaintiffs gave in evidence an execution of Fi. Fa. in the name of Mary Norvell against John C. Littlepage, (the defendant in this cause,) Thomas Starke, (the testator of the plaintiffs in this cause,) and John Slarke, on which the sheriff returned on the 151 h of December, 1798, “ made on this execution by the sale of negro Judy and her two children, Nancy and Maria, purchased by Thomas Starke, forty-five pounds.” They also produced several papers in the hand-writing of the defendant, and signed by him, one dated April 2, 1804, in these words: “I do hereby certify, that Judy and her family, that are now in my possession, (and were some years ago purchased by Major Thomas Starke, at a sheriff’s sale,) are held by me the same terms that they have been for some years past; and I consider myself bound to Major Starke for the hire agreed upon between us for them.” Another, dated the 20th of March, 1809, in these words: “ I-do hereby certify, that Judy and her family are now-in my possession, and were purchased some years ago at a sheriff’s sale, by Major Thomas Starke; are held by me on (he same terms that they have been for some years past; that is to say, I am to pay hire for them;” and on the back of the last one, in these words: “ I do hereby acknowledge and renew the within writing or agreement, between Major Thomas Starke and myself. Given under my hand and seal, this 27th day of November, 1813;” and another at the foot of the last mentioned writing, in *370 these words: “ I do hereby renew and re-acknowledge the above and within writing. Given under my hand and seal, this 4th day of November, 1818.” These two last were signed and sealed by the defendant. The suit was insti(u(;ed, March 24th, 1819.
To repel this evidence of title offered by the plaintiffs, the defendant offered to introduce the parol acknowledgment of Thomas Starke, made cotemporaneously and subsequently to the sale, and other parol evidence, for the purpose of proving, that the purchase by the plaintiff’s testator of the slaves in the sheriff’s return mentioned, at the said sheriff’s sale, was not a real and bona fide purchase of the same, but was made with the defendant’s money, and was intended by the said plaintiff’s testator and the defendant, as a cover to protect the said defendant’s property from execution by the other creditors of the said defendant. This evidence was objected to as incompetent by the plaintiffs; but the Court over-ruled the objection, the evidence was given to the jury, and they found for the defendant.
The evidence offered by the defendant, is objected to on two grounds; first, that it was not competent to the party to give parol evidence to impeach his acknowledgment of the plaintiff’s title, under his hand and seal; and secondly, that he could not give in evidence his and Starke’s fraud upon his creditors, to impeach Starke’s title, under the acknowledged sale to him by the sheriff under the execution.
The first objection is well founded as a general rule; but has no effect in this case. If the defence, grounded upon the alleged fraud, was admissible, then the evidence to prove the fraud was also admissible; so that the last objection to the admission of the evidence, is the only real question in the cause.
This objection, I think, should prevail. The proof of the sale offered by the plaintiffs is complete, and acknowledged by the defendant. The Statute of Frauds avoids *371 fraudulent transfers of property only against creditors subsequent purchasers, leáving them to operate as between the parties, as they operated-at the common law; and it has been determined both at law and in equity, that a combination between the plaintiff and defendant to defraud crcdifors, does not invalidate the legal effect which the transaction would have, as between the parties, if there had been no fraud. The maxim, nemo allegans suam turpitudinem est audiendus, once applied to a different purpose, seems to be justly applicable to a case like this.
In the case of Hawes v. Leader, Cro. James, 270, (reported also in Yelv. 196, and Brownloio, 112,) this point has been decided at law, and has never since been questioned, but uniformly recognised as good law, as in Orlabar v. Harrison, Cumb. 348, by Holt, Chief Justice. In that ease, the intestate of the defendant granted by deed to the plaintiff, all his goods contained in a schedule, and covenanted to deliver them quietly to the plaintiff. After the death of the grantor,- the grantee bi’ought an action of debt against his administrator, for the goods mentioned in the schedule. The defendant pleaded, that his intestate was largely indebted, specifying the debts, and that the deed was made by fraud and covin between his intestate and the plaintiff, to deceive those creditors, and that his intestate, notwithstanding the deed, used and occupied the goods during his life-time. To this.plea, the plaintiff demurred, and had judgment upon the merits.
There is no case in equity, where relief has been given to the fraudulent grantor in such a ease, except in that of Austin v. Winston, 1 Hen. & Munf. 33, decided by a divided Court. The relief given in that ease, was founded upon the fact, that the grantee, a creditor, the debtor being in distressed circumstances, had availed himself of his power over Mm, to induce the debtor to unite in the fraud; the creditor having proposed and urged the execution of the scheme, which was adopted for that purpose. No circumstance of that sort is suggested in this case. The general *372 rule, that a Court of Equity will give no relief to the fraudulent grantor in such case, is affirmed in Cary’s Rep. 18, in which it is said to be a maxim, that, Fraus non est fallera fallentem. and by the decision of this Court in Bishop v. Estes, (not reported.)
It is a general rule that “ in pciri delicto potior est conditio defendentisand this was the principle of the civil law. “Porro autem, si et dantis et excipientis turpis causa sit, possessorem potiorem esse, et ideo repetitionem cessare.” Dig. Lib. 12, tit. 5, (6) 8. But, this rule operates only in cases, where the refusal of the Courts to aid either party, frustrates the object of the transaction, and takes away the temptation to engage in contracts contra bonos mores, or violating the policy of the laws. If it be necessary, in order to discountenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done, though both the parties are in pari delicio. The party is not allowed to allege his own turpitude in such cases, when defendant at law, or prevented from alleging it when plaintiff in equity, whenever the refusal to execute the contract at law, or the refusal to relieve against it in equity, would give effect to the original purpose, and encourage the parlies engaging in such transactions. Thus, if a man be bound upon condition to commit a crime, the contract may be avoided by the defendant. But, if a feoffment be made on the same condition, it is good and unavoidable. Co. Litt. 206, (b.) One of two joint wrong-doers cannot claim contribution against the other, at law or in equity; and a bond given for past cohabitation will not be relieved against in equity. But, a bond given for future cohabitation is void at law, (Wallace v. Perkins, 3 Burr. 1508,) and would in general be relieved against in equity. A bond or contract, in consideration of the sale of an office, even when not avoided by Statute, will be relieved against in equity. In these, and many other cases, collected in the notes to Fonblanque’s Equity, ch. 4, sec. 4, the contract is enforced or avoided, both at *373 law and in equity, as may best answer the -purpose of discouraging the fraud, or contract against the policy of the law; and it is for this purpose, and not because the defendant is, in such cases, strictly entitled on his own account to be discharged from his contract, that the rule is established, that in pari delicto potior est conditio defendentis; a rule which, in general, discourages vicious contracts, but which is not enforced, when it would counteract this policy of the law.
The cases of Montefiori v. Montefiori, 1 Black. 363, and Gay v. Wendon, 2 Freem. Rep. 101, afford a good illustration of these propositions. In the first case, a note was given by Ji. to his brother, who was absent to be married, to give him the appearance of being in belter circumstances than he was. After the marriage, A. re-claimed this note, and arbitrators awarded it to be given up. The award was set aside as palpably against law; the Court holding that when upou proposals of marriage, third persons represent any thing material in a light different from the truth, even though by collusion with the husband, they shall make it good in the manner in which they representéd it.
In the other case, a brother gave to his sister, upon her marriage, Í50i. and she gave her bond to him privately, before the marriage, to return it. The husband died without issue; and the brother sued upon the bond at law. She filed a bill to be relieved, on the ground of the fraud. It was argued for the brother, that although the husband or his issue might, with good reason, claim relief in equity, yet there was no reason why she, who was particeps fraudis, should be relieved. But, the plaintiff was.relieved, notwithstanding it was her own fraud.
The particeps fraudis, in the first case, recovered at law, and, in the second, was relieved in equity, because otherwise, the fraudulent arrangement would, in both cases, have had its intended effect, and served as an encouragement to the practice.of similar frauds. To prevent this effect, it was necessary in both cases to reverse the general *374 rule, that in pari delicto potior est conditio defendentis. The circumstance that third persons were interested had no influence upon these decisions; certainly not on the last; for, no person was or could be interested, but she who was a participator in the fraud.
The case of Law v. Law, 3 P. Wms. 391, proceeds upon the same principle. In that case, the transaction was not intended to injure or defraud any third person, nor was it against the provisions of any Statute, but was contrary to the policy of the common law. Nor was there any advantage taken of the circumstances of the one party by the other; nor was it a case in which the policy of the violated law was to protect one party against the other; nor was there the slightest inequality in the demerits of the parties; so that the relief given in Chancery to the complainant, could have been founded on no other reason, than that to vacate such contracts by the active interference of the Court, was the only effectual means of discouraging such contracts. If the maxim that “in pari delicto potior est conditio defendentis," had been considered as inflexible, or only yielding when the law violated was intended to protect one of the parties against the other, or where a fraud was practised on third persons; no relief could have been given to the plaintiff in that case, which was this: A. by his interest with the commissioners of the excise, procured for his brother B. a supervisor’s place in that office, and in consideration thereof, B. gave a bond for the payment of 10Í. per annum to A. as long as B. should continue in office. JB. died, having for some years omitted the payment of the 10Í. A. sued on the bond against the executrix of B. who filed her bill to be relieved against the bond; and it was decreed to be delivered up as a fraud upon the public; not because it took any thing from the public, but because it was against the policy of the law.
To this principle too, must be referred the jurisdiction of a Court of Equity, to compel the surrender of securities given for money won at unlawful gaming. In such *375 cases, the turpitude of the parties is precisely equal, and there is no other foundation for the jurisdiction of the Court interfering actively in favor of the plaintiff, but that such interference promotes effectually the policy of the Jaw.
To allow a fraudulent debtor conveying his property to another, with intent to defraud his creditors, to allege that fraud for the purpose of avoiding the transfer, would be using the maxim of the law to frustrate the policy of that very maxim, by giving full effect to the fraudulent contrivance of the parties, according to their intent; and indeed, rather to enforce, than to frustrate, the fraudulent contract; and debtors might, with perfect impunity, practise frauds upon their creditors. I think, that the case of Hawes v. Leader, Cro. James, 270, is founded on sound principles of law and policy; that the judgment in this case ought to be reversed; and a new trial had, in which the evidence of the fraud, allowed to be given at the former trial, should not be admitted.
Judge Coalter.
The testator of the appellants, purchased the slaves in question, or their progenitors, at a sheriff’s sale, under an execution against the appellee, about twenty years before the institution of this suit, with the money of the appellee, and under a fraudulent agreement between them, that the appellee should continue to hold the possession, acknowledging every five years that he so held under an agreement of some kind or other, and that he was to pay hires, in order to cover the property from the creditors of the appellee; when in reality, the property never was to be claimed by the testator, nor any hires to be paid.
In this situation, the property has remained as aforesaid for 20 years, and until the death of the testator. His executors, however, finding the written acknowledgments aforesaid, amongst his papers, have-thought it their duty to *376 sue for and recover the slaves, now amounting, men, women and children, to ten or twelve.
The fact of this combination, was strongly inferrible from the long possession of the appellee, as exhibited in jjle pr00f adduced by the appellants, under mere written acknowledgments of possession, under some undefined contract, and some agreement for hires, without specifying to vl'hat amount; but full proof of the whole was offered by the appellee, and admitted by the Court; and the question is, whether it was correctly admitted.
Let us suppose, that this claim was set up by the testator himself: that in addition to the fraud he had been aiding in as to creditors, he was seeking to violate his faith with the appellee, and recover the slaves; and that all this had appeared from his own shewing. Would it be a case a Court of Justice ought to lend him their aid? On the other hand, suppose he had gotten possession, and the appellee had come in upon the same evidence to regain it. Would he be heard ? It seems to me, that this is one of those cases, in which the Courts ought to leave the parties where they leave themselves. They ought not to countenance or aid in such a scandalous transaction, and although there may not be strictly par delictum, (for I am not prepared to say, that a man who, under the guise of friendship, will take another’s money and purchase in property for him, under circumstances of concealment, &rc. by which a falling man seeks to postpone his creditors, and who shall violate that confidence and take the property to himself, is not guilty of'a blacker crime than his necessitous and confiding neighbour,) yet it must be admitted, that in point of law, they are to be considered in pari delicto.
But, it is said, that we must aid éven in a case as scandalous as this, by way of punishment on the fraudulent debtor, and as a salutary means of enforcing the law, and preventing such combinations. As to punishment, if that could be inflicted with some regard to the degree of the offence, and without benefiting him without whose co-ope *377 ration it could not have been committed, and whose acquiescence and countenance may have been a strong temptation to carry it into effect, I would have no objection to see an adequate punishment imposed. But, the particeps criminis, who ought also to share in the'punishment, is not a proper party to ask, or for whose benefit to inflict it. As it regards the good of society, I much doubt whether the example of a Court, sustaining and enforcing such a flagitious claim, thereby shielding it as it were, by the cloak of the law, is not calculated to do more harm than good. No man could, for a.moment, sustain the claim of the testator to these slaves, on the score of morality or common honesty. But, let the Courts say, that he ought to punish the party in this way, for his attempt to defraud his creditors, and would not this at once hold out a temptation to the wicked and guileful, to tamper with necessitous and falling men; gain their confidence, and by entering into their schemes of this kind, get a fraudulent claim on their property, and recover it for themselves? They would be assured, if not entitled to praise and credit for thus punishing him by taking his property, that they would at least have the countenance of a Court in doing so.
Two cases that have been before this Court, Austin v. Winston, 1 Hen. & Munf. 33, and Bishop v. Estes, (not reported,) are sufficient proofs to me, that no temptation of this kind ought to be held out to designing men to entrap the necessitous and unwary.
On the other hand it may be said, that unless he can do so, the debtor may enter into combinations of this kind, with impunity, &c. But, this will not be so in general, because, as most frequently happens, his confederate must be put in possession; for, except where the property has been changed, as in this case, by a seizure and sale of a sheriff, or something of that kind, a pretended sale, the seller still remaining in possession, will not do. The fraudulent debtor frequently, and most generally, has to trust entirely to the good faith of,his confederate; and I think- *378 it comports most with the dignity of the law, and of the Courts of Justice, to say to these parties, “You have no business here. You shall not call on a Court of Law, to enforce a contract that is contrary to law.”
This was said in Collins v. Blanton, 2 Wils. 307, and it seems to me, is the better course, as well for public example, as to preserve that purity which, belongs to the ermine of a Court of Justice, and which no polluted hand shall be permitted to soil. In the case of Austin v. Winston, 1 Hen. & Munf. 33, the fraudulent debtor came in to be relieved against the fraudulent purchaser, who had, partly by force and violence, and partly otherwise, gotten possession.
The maxim, “ in pari delicto potior est conditio defen dent is,” was admitted and applied by Judge Tucker to that case, who says, that without undertaking to balance the guilt of the parties, both appear so culpable, that had Austin been the plaintiff and Winston the defendant, he should have held him as little entitled to the aid of the Court as Winston. The other Judges, and particularly Judge Roane, did not consider it a case of par delictum, but that Winston had been seduced into the measure by Austin. But for this circumstance, I take it, they would have concurred throughout with Mr. Tucker.
The maxims, “ volenti non fit injuria,” and “ in pari delicto, 8?c.” have been sometimes applied to cases to which they do not belong; as in Tomkins v. Bernet, 1 Salk. 22, and so it was attempted to be applied in Clarke v. Shee, Cowp. 200; in Browning v. Morris, Ib. 790, and in Smith v. Bromley, Doug. 670, in a note. But, in these cases, there was not par delictum-, and so the maxim was held not to apply.
There is another class of cases, too, in which it does not apply; as where third parties will be defrauded, or public policy evaded, in case the party who comes in shall not be sustained. Thus, it is of great consequence to the public, that marriages should be fairly and freely contracted; and so *379 marriage brokage bonds, and cases where a bond is given, or money advanced, to induce one contracting party to believe that the other is in better circumstances, though there is a secret contract to cancel the bond, or return the money. All these cases are properly held not to be within the influence of the maxim; and it is remarked by Judge Roane, in Austin v. Winston, “ that these agreements in fraud of marriage, must bind, on the ground that you cannot put the wife in statu quo, or unmarry the parties; and marriage is so much favoured in equity, that we are told, 3 P. Wms. 66, that it is a case, and perhaps the only case, in equity, in which a particeps criminis is permitted to avoid his own acts; so highly favoured is the consideration of marriage.”*
The doctrine he subscribes to, he says, is this: “ That in cases of equal frauds committed against third persons, (when the parties thereto are equally guilty, although such frauds operate no injury to the rights of such third persons, and create no rights in favor of the parties thereto, yet in that case possession stands for the right, and one volunteer in such fraud may, as against his equally guilty companion, retain any advantage he has gained. But, right is out of the question; and if the turpitude of his adversary is done away, his possession, or his advantage cannot avail him. He does not stand on any merit of his own, but merely on the ground of the incompetency of his adversary to be received or countenanced in a Court of Justice, to set up a scandalous pretension, in which he is equally particeps criminis' Again, he says: “It is on all hands admitted, as a general, perhaps universal proposition, that in pari delicto potior est conditio defendentis; but, in the application of this rule, some important distinctions have been solemnly and ably settled. It is said in them, that the prohibitions enacted by positive law, in respect to contracts, are of two kinds; 1st, to prevent weak and necessitous men from being over-reached, defrauded or oppressed; 2d, those prohibitions which are founded in rea *380 sons of public expedience;” and he refers to Clarke v. Shee, Browning v. Morris, and Smith v. Bromley. Thus it would seem, that but for the circumstances in that case, which were deemed by him, and a majority of the Court, sug¡c¡ent f0 take it out of the influence of the maxim, they would have permitted possession, however acquired, to stand for right, and would not have heard the party. But here, the possession never was disturbed, never was intended to be disturbed, and never can be disturbed, except by the aid of a Court of Justice.
The case of Law v. Law, 3 P. Wms. 391, where a bond was given to one for his influence in obtaining a place in the excise, was.not within the influence of the maxim, because of the great interest of the public in such appointments, and that they should not be influenced,, and those having the appointments deceived, by recommendations arising from interested motives. So too, in cases where relief is given against gaming debts. It greatly interests the public to suppress-gaming. The parties coming for relief in such cases, though parties in guilt with those they come against, nevertheless represent, as it were, the interest of the Commonwealth; and such cases fall within the reason of the cases, where a fraud has been attempted on a third person, and which must be consummated but for the aid which will be extended to theparticeps criminis. In such cases, if the maxim were to apply, the fraud would take effect on the innocent, or the public policy would be defeated. But in this case whoever holds or recovers the property, the rights of the creditors are equally unaffected. Indeed, the continued possession of Littlepage, covered with the veil of gauze, used in this case, was much less calculated to deceive creditors, than if the possession had remained all this time with Starke, he secretly paying over a reasonable hire, and finally lifting the veil by devising the property to hipa, as he probably would have done under these circumstances. But, he has departed this life, without taking the precaution to destroy the papers, and a *381 possession which he never was to take, and never intended to take, is to be obtained in behalf of his estate, by the aid of a Court of Justice.
I have placed this case on the ground of a suit by him, and in which the whole case is made out by the evidence on the part of the plaintiff; for, if the recovery can be had in the case before us, I take it that the agreement equally proves that it could be had in that case.
The case of Hawes v. Leader, Cro. James, 270, is the only case-1 can find, which seems in conflict with the view I have taken. There the fraudulent grantee paid 20i. for goods worth 80i. with intent between the seller and purchaser; to defraud the creditors of the vendor. The vendor gave his obligation safely to Jeeep and quietly to deliver them to the vendee, and bound himself in 40i. to do so. Pie died, and suit was brought for them against his executor. The plea set out the fraud &c. and that there were debts to pay, &c. and to this the plaintiff demurred, and it was adjudged for him. That case differs somewhat from this. In that, a consideration, though an inadequate one, was given, and there was a covenant to deliver. Now it has frequently happened, that a sale, though for value, is nevertheless fraudulent and void as to creditors, in construction and operation of law. Several causes of demurrer were assigned; but on which of them it was decided, is not stated; though I admit there can be little doubt, that it was decided on the fifth, viz: that the defendant is not such a person as is enabled to plead that plea. For, the Statute makes the deed void as to creditors, but not against the party himself, &e.
There seemed to be doubts, whether the executor, in favor of creditors, was not entitled to set aside the deed; a doubt which was settled in the case of Orlabar v.-, Cumb. 348, and which seems to have been a suit in Chancery brought by an executor to set aside a sale of that kind, in which an issue was directed to try whether two bills of sale were fraudulent. Halt said, there was no doubt that *382 an executor or administrator as such, shall not avoid a fraudulent bill of sale; but, when he is a principal creditor, as seemed to be that case, then it may be doubtful. But; however, that will be considered in equity, not here. By thjSj j understand that an executor, as such, cannot bring-a suit to set aside a fraudulent bill of sale; and so it has been uniformly held. The creditor has a right to go against the goods directly, not through the executor or administrator* But, if the goods came to the possession of the executor or administrator, they are subject to the executor of the creditor; and .this case in Cro James, above cited, is the only one I can find, which justifies the recovery of them from the executor or administrator. The question, whether either a Court of Law or Equity ought to aid in that recovery, or leave the parties where they find them, is one which was not made, and seems not to have been considered, in that casé; and it seems to me, that the principles of the late decisions are better calculated to preserve the purity of justice,' and that there are few cases in which it would be more proper to apply the maxim than in this.
In this, I feel confirmed by the opinions of the Judges of this Court in the case above cited, and which I do not understand is at all opposed by the late case of Bishop v. Estes, (not reported) in which the fraudulent, vendor came in on the ground taken in Austin v. Winston, but failed in making out his case. Indeed, I do not well see when it can be applied, if not in such a case as this. A bond is given- for the purpose of procuring witnesses not to attend on a criminal prosecution. This consideration was held, in Collins v. Blanton, to be a good plea in bar to a suit on the bond, on the ground that the party coming into Court on such a contract, will not be aided. Had the money been paid, the other party could not have come in. Would not the recovery in such case more effectually punish and prevent the offence than the refusal ? The refusal of the recovery deprives the plaintiff of nothing, takes no money from him, for which, he has given any value, and so pu« *383 nishment falls on no one; not even on him who, by a promised bribe, caused the offence to be committed. But, a recovery would have punished him, who was the tempter to the wicked act. It is then laid down, that whether the contract is void by the Statute, or by common law, makes no difference. Courts of Justice go on the principle of enforcing contracts not injurious to society ; and it would be absurd to say they shall enforce those that are. It is on these great and leading principles that I rely. I wish to protect the Courts from hearing, much less from adjudging, in favor of, or enforcing, such contracts; to scout all such parties from our presence, as without the pale of the law, and not entitled to the least consideration. Such a course, it séems to me, is best calculated to reprobate the offence, and prevent its commission.
For these reasons, though I confess not without some doubts, I am for affirming the judgment.
Judge Cabell concurred with Judge Green, and the judgment was reversed.*