Per THOMPSON, J.
Can a defendant be protected by the principle of par delic-tum, when he does not allege it, and claim the benefit of it in his answer, but denies all fraud, and alleges the perfect fairness of the whole transaction as in this case? |
Daniel. The court will certainly apply this rule as a principle, governing and controlling the active interference of courts of equity. The cases cited show this.
CEOPTON, J.
The plaintiff Elliott, in his original bill, alleges, that he was theretofore much addicted to habits of intoxication ; that whilst in that state he often made improvident bargains, and was frequently imposed upon by the cunning and designing, and induced to *pur-chase property much beyond its intrinsic value, and particularly refers to the purchase of an old vessel, for which, whilst drunk, he gave a most extravagant price; and, by wajT of security, was induced, whilst under the intoxicating influence of ardent spirits, to give a deed of trust upon property of much greater value; that when he became sober he mentioned the circumstances touching the purchase of the vessel to the defendant Smith, who, imposing upon him, persuaded him to convey to said Smith a tract of land, several sláves, and sundry articles of personal property; that Smith took possession of the said property, and took the plaintiff to live with him; that the deed was without consideration, and he was persuaded to make it by Smith, who promised to stand his friend, and to protect him from the imposition in the purchase of the vessel ; that he lived with Smith and labored for him without wages; that the individual from whom he bought the vessel had agreed to take her back and vacate the purchase; that when he requested Smith to restore to him his property, he was dismissed by Smith from his house, and that Smith still withholds the property from him; and he prays to be relieved from the contract.
The defendant, Smith, demurred to the bill, and also filed his answer, in which he says that he remembers to have heard that a vessel was bought by the complainant or some other person, but is ignorant of the price or other terms. He denies that he ever persuaded the complainant to make a deed, or that the complainant did at any time execute a deed under any suggestion from him. He avers that he purchased from the complainant five slaves, at the price of $360, and exhibits the bill of sale for them, with his answer, bearing date on the 10th day of October, 1831; that at the same time he purchased the land of the complainant at the price of ^100, and gave his note to the complainant, with his note for the purchase money of the slaves; that the price of the slaves was to be paid in such debts of the complainant as he should take up; that he paid *a number of debts of the complainant, and the whole was settled according to the note and the credits endorsed (and he files the note with the credits endorsed with his answer) ; that on the 7th of June, 1832, the whole was fully settled, at which he made a verbal agreement with Elliott that he should retain the sum of ^100 in his hands, and support Elliott as long as he lived; that Elliott lived with him about two years; *569 that he then left, and he re-conveyed the land to Elliott at the same price, having the ;£100 already in his hands; that all the conveyances were for full consideration, and that he had never promised Elliott to stand his friend in anjr particular manner, or to protect him from the imposition about the vessel, or to restore him the property.
The plaintiff filed an amended bill, in which he charges, that for some time before the execution of the deed to Smith, from excessive intemperance from the immoderate use of ardent spirits, furnished to him by Smith, from his store, he was rendered wholly incapable of managing his own concerns, and unable to appreciate the consequences of acceding to the iniquitous suggestions of Smith, and was induced by his artful persuasions to execute the deed, without consideration. To this amended bill Smith demurred, and filed his answer, in which he denies all the allegations and avers the perfect fairness of the deed. The plaintiff filed a second- amended bill, in which he repeats rather more fully the charges of the first. Smith again demurred, and answered, denying all the allegations.
Upon this state of the pleadings, the transaction between the parties was either, in the version given of it by the defendant, a fair and honest transaction, or, according to the allegations of the original bill, as I understand them, a fraudulent device to hinder, delay and defraud the creditors of the plaintiff.
Upon the fairness of the transaction much doubt is thrown, by the receipts endorsed on the note filed with the answer to the original bill, and the account given in *the answer of the manner of the final adjustment of the debt. The note is for two distinct sums, to wit: £100, the price of the land, and $360 the price of the slaves. The answer alleges, that on the 7th of June, 1832, it was verbally agreed, between the parties, that £100, the price of the land, should remain in Smith’s hands, in consideration of which he was to support Elliott as long as he lived. It appears by the endorsement of credits on the note, that on that day the sum of $119 83 only was endorsed as paid, so that the precise sum of £100 was not then in the hands of Smith; and as there are four other credits of preceding date endorsed, the largest of which, for $423 25, is dated on the 20th of May preceding, Elliott must have returned some of the money he had already received, to make up, with the sum for which a receipt was then given, though not paid, the sum of .£100, which, by the agreement, was to be left in Smith’s hands for the support of Elliott during life. Of this discrepancy no satisfactory explanation is furnished. In addition to this, there are other circumstances of suspicion in the record. The conversation between the defendant and Kemp Elliott, (the witness,) on the 1st of January, 1832, about the treatment of the plaintiff by others in relation to his property, in which no allusion was made to the deed for the land and bill of sale for the slaves of the plaintiff to the defendant, executed early in the preceding November, according to the exhibits filed, and the remark of the defendant to the same witness on another occasion, that what had been done (alluding to said conveyances) was not to defraud just creditors, but unjust ones — such as Powell and Clarke, and another.
But if these circumstances amounted to more than suspicion, and produced certainty in the conclusion to be deduced from them as to the character of the transaction, then we are thrown upon the other branch of the alternative, that it was a fraudulent contrivance resorted to by Elliott to defraud his creditors, in which he was aided by Smith. And is he entitled to be relieved from *its consequences? A large mass of testimony is on the record; and so far as it consists of the opinions of the witnesses of Elliott’s capacity, the conclusion is unavoidable, that he possessed sufficient legal capacity. In addition to this, he was appointed by the County Court surveyor of a road, and commissioner, with others, to settle accounts, and was sworn on grand juries — and since the institution of this suit he gave testimony as a witness before the Circuit Court of his county in an important cause; and several of the jurors who have been examined in this case, depose, that upon his testimony, from the clear, consistent and satisfactory manner in which he detailed transactions of long anterior date, their verdict was in a great degree founded. I am satisfied, from the evidence, that Elliott, although possessed of sufficient legal capacity, was an illiterate man, and while under the influence of intoxication was occasionally (like other men in the same situation) incapable of attending to business properly. The plaintiff, in his original bill, inconsistently with the allegations of the amended bills, says that he was sober when he mentioned to Smith the purchase of the old vessel, and was persuaded by him to make the conveyance of his property. Two of the subscribing witnesses to the deed and bill of sale (the third having died) depose, that when he executed them he was sober, that he brought the papers to them himself, and requested them to witness them, that the papers were read over to him, that he executed them freely, and that Smith was not present. There is no proof whatever in support of the allegations of the two amended bilis, that Elliott was, at the time of the execution of the papers, under the influence of ardent spirits supplied to him by Smith, or that Smith had at any time furnished him with liquor. On the contrary, in opposition to the allegation of the first amended bill, that it was supplied from Smith’s store, it is proved that Smith had not kept a store for eight or ten years; and although Smith was greatly superior to Elliott in intellect, and of more prudent *habits, as there is no scale by which we can measure the grades of intellect of different men possessed of legal *570 capacity, they must be held to be of equal capacity unless it be held that every debtor, who attempts to defraud his creditors by the aid of a man of superior intellect, shall be protected against the perfidy of his instrument, and thus abrogate the maxim, “in pari delicto potior est conditio defend-entis.” But men of equal capacity must act freely to be the subjects of this maxim; and if there is any such undue influence or coercion, as deprives the mind of its freedom, and thus induces the debtor to concur in a fraudulent scheme, which, though presenting other inducements to a mind so disposed, he would not have adopted, he is entitled to relief. In this case there is no testimony tending to prove that Smith' exerted any arts, or used any undue influence over Elliott, or that he possessed any such influence, or held any relation towards him which might enable him to possess or use any such influence. On the contrary, it is in proof,_ that shortly before these transactions Elliott and Smith were hostile towards each other. Indeed, there is no proof that E'liott had been fraudulently imposed upon by any one, nor is there any proof, even of the alleged imposition in the purchase of .the old vessel, against which he sought to protect himself by defeating the deed in trust given to secure the purchase money, which also included another debt admitted to be just.
Being of opinion that Elliott possessed full legal capacity; that he acted, when sober, freely and without any undue influence or concern; and considering the transaction in the view presented by the original bill, it is a case of par delictum, in which he is not entitled to relief, but must be left where he has placed himself, in conformity with the provision of the law, which enacts, that fraudulent deeds shall be void as to third persons, leaving them to operate between the immediate parties. I therefore concur with a majority of the court, that the decree be reversed, with costs, and the bills be dismissed without costs.
*GIEMER, J.
This was a suit in chancery, brought by George Elliott against Henry Smith, to recover certain lands and slaves conveyed by Elliott to Smith. The original bill (as I understand it) set forth a case of fraudulent combination between the plaintiff and defendant, to cover up the plaintiff’s property for the purpose of defeating certain creditors of his —whose claims the plaintiff alleged were fraudulent and unjust. Two amended bills were filed, praying for relief, on the ground of incapacity, produced by excessive use of ardent spirits furnished by Smith to the plaintiff. There was a demurrer to the first amended bill, on the ground, that no one was made a party defendant, and the demurrer was well pleaded. The defendant answered, denying all the allegations of the amended bill; and there being no proof to sustain them, it is unnecessary to notice them further; and the only question is, whether plaintiff is entitled to relief on his original bill.
I have no doubt that the plaintiff intended, when he conveyed his property to Smith, to defraud some of his creditors,’who, as he alleged, had defrauded him; but whether this is true or not, does not appear in the record. I have as little doubt that Smith intended to over-reach and defraud the plaintiff, and that he has to some extent carried out his purpose.
I am satisfied, from the evidence, that the plaintiff had sufficient capacity to make a valid contract when sober, and that he was sober when the contract in question was made.
It is needless to cite authorities to prove, that a fraudulent contract, made between two parties, competent to contract, both participating in the fraud, though it may not be binding on third persons, is binding on them and those claiming under them. This is the general rule, to which, however, there are many exceptions, and the judge who decided this case in the Circuit Court, was of opinion, that this came within one of those exceptions, and that the plaintiff and defendant, *though both “in delicto,” were not in pari delicto. Being satisfied, as already stated, that Smith intended to defraud Elliott, and had succeeded in doing so, and feeling a strong inclination to make him disgorge, I was at first strongly inclined to concur in that opinion; but subsequent reflection, and a closer examination of the authorities, have satisfied me that the opinion is not well founded.
As has been already stated, the plaintiff, when he sold his land and negroes to Smith, had sufficient capacity to make a valid contract; and although the defendant was a man of superior information and intelligence to him, I have not been able to find any case in which this circumstance alone has been held sufficient to take a case out of the influence of the rule above stated. On the contrary, in all that I have seen (and they are numerous), the party against whom relief has been granted, in such a case, stood upon some vantage ground, or bore some such relation to the other as to preclude the idea of their dealing upon equal terms — such as creditor and debtor, parent and child, guardian and ward, &c. We find it laid down in the books of the highest authority, both ancient and modern, that “courts will not undertake to measure the size of men’s understanding.” It would be an infringement of this wise and well settled rule, to set aside a contract on this ground alone — -to say nothing of the difficulty of ascertaining, with any precision, what difference there is (legally) in the guilt of two men participating in an illegal act, one of whom happens to be more intelligent than the other, or better informed on general subjects, however easy the solution might sometimes be in a moral point of view. No such distinction is made in testamentary or criminal cases, and I think no analogy can be found for it in our laws. In cases of the first kind referred to, the question is, Was the supposed testator corn- *571 petent at the time to do the act in question; had he capacity sufficient to understand it? And if that be the only ground of objection, there the enquiry stops, *and the testamentary act of the weakest and most ignorant man (if competent) not less valid and binding than that of the wisest and most intelligent: and so in a criminal case, if several participate in the act as principals, the law makes no distinction in the punishment of one who might have the learning and ability to plead his own cause and of one who merely knows right from wrong.
I have thus far considered mere weakness of intellect alone as a ground for sustaining the decree of the Circuit Court, not as a link in a chain of testimony to establish fraud or undue influence. How does the case stand on that ground? It is alleged in the original bill, that the plaintiff was persuaded by the defendant to make the contract, and if this had been proved, the case might have been a very different one; but this allegation is denied in the answer, and there is no proof of the fact. So the case must stand on the naked ground of difference in the intelligence of the two contracting parties — for there is no pre-tence that any relationship existed between them, or that they were so situated as to give the defendant Smith any undue advantage over the plaintiff in any other respect. I have seen no case as much like this as the case of Austin v. Winston, 1 Hen. & Munf., and the distinction between that case and this is broad and plain. Austin was the creditor of Winston, and it was proved that he persuaded him to sell his slaves, and alarmed him by telling him, if he did not, he would be ruined. The four judges, who decided the case, were equally divided in opinion, and the decree entered was a compromise, and their opinions were based on the grounds above stated. The subsequent cases of Starke v. Littlepage, 4 Rand. 368; James v. Byrd, 8 Leigh, 510, shew, that the Court of Appeals does not think the principle ought to be carried any farther, if so far even, as it was carried in that case, and in that opinion I fully concur.
Relief is denied to either party in a fraudulent contract seeking to recover his property disposed of under *it, not because of any desire on the part of the court to aid the party in possession, but from principles of public policy to keep the fountains of justice pure.
The true test for determining whether or not the objection, that the plaintiff and defendant were in pari delicto can be sustained, is by considering whether or not the plaintiff can make out his case, otherwise than through the medium and by the aid of the illegal transaction to which he was himself a party. Simpson v. Bloss, 7 Taunt. 246; and here the plaintiff comes into court alleging his own fraud.
For the reasons above stated, I think this case comes clearly within the principle of par delictum, and that the decree of the Circuit Court must be reversed.
THOMPSON, J.
It seems to me very clear, upon the pleadings and proofs in this cause, that one or the other of two conclusions is inevitable; either that it was a fair and bona fide absolute sale for an adequate consideration paid by Smith, as alleged in his answer; or that it was a pretended, simulated, or fictitious transaction, as alleged in the original bill, or a sham sale, as characterized by Kemp P. Elliott in his deposition ; both of which are equally fatal to the plaintiff’s pretensions, and decisive against the relief sought by his bills, original and amended. The pleadings and the proofs will justify no other hypothesis, and leave us no other alternative. According to my reading and construction of the original bill, it alleges substantially, if not in totidem verbis, a sale and conveyance made to defraud, hinder and delay creditors of the grantor, and the object and purpose of both of the amended bills, seem to have been either to retract the admissions contained in these allegations, or to qualify them in order to evade or avert the legal consequences attached to them, by super-adding allegations of imbecility, natural or superinduced by habitual intoxication, to exempt the plaintiff from responsibility for his contracts, or from the legal imputation of being a particeps fraudis.
*1 think there is an overwhelming preponderance of testimony in favor of the capacity of Elliott, both legal and equitable, to contract; that he made the contract or conveyance in a state of sobriety, freely, voluntarily, and of his own accord, without any undue influence possessed, or persuasion employed, on the part of Smith to induce him to do so; and, if I considered only the contract itself, the testimony in favor of capacity and free will or voluntariness given by the subscribing witnesses, the adequacy of the consideration stated, together with the previous declarations of intention on the part of Elliott to sell to Smith, and subsequent admissions, that he had sold and received the purchase money in full, I should, without hesitation, hold it was a fair and bona fide absolute sale, as alleged in Smith’s answers. But it must be confessed, that the receipts or ac-quittances endorsed on Smith’s bond, taken in connection with the version given of the transaction in his answer, coupled with the declaration of both Smith and Elliott, as to the nature of the arrangement, cast a dark shade of suspicion upon it, and tend strongly, if not conclusively, to establish the truth of the version given of it in the original bill, to wit: that it was a conveyance made without consideration, to defraud creditors; and if so, the only question is, whether George Elliott was capax doli or rather capax fraudis, so as to render him a proper subject for the application of the rule founded upon the par delictum of the parties, a wise and salutary rule or maxim of the common law, applied by courts to the perpetrators of fraud and iniquity, before *572 it constituted a part and parcel of the written law, as it now does in that provision of the statute against fraudulent conveyances, which declares that such conveyances, though null and void as to creditors of the grantor, shall nevertheless be deemed, held and taken as valid and obligatory between the parties to such fraudulent conveyance, and those claiming under them.
I am unable in this cause to perceive any sufficient ground for exempting Elliott from the application of *the rule; and upon the ground so well stated in the opinions of Judges Gilmer and Field, and so strongly fortified by both reason and authority, I am clearly of opinion, if this transaction was in fact a fraudulent one on the part of Smith, as these judges hold it was, and as I cannot but suspect it was, it was a fraud meditated upon the creditors of Elliott, in which he concurred and participated, and against which he cannot be relieved. It is a characteristic of fraud, resulting from its verj- nature and essence, that confederates in fraud directed against others, will prove faithless to each other, and it is fortunate for the safety and welfare of society that it is so; hence the wisdom and sound policy of the maxim, that “in equal guilt better is the condition -of the defendant,” which forbids the tribunals of justice from lending their aid to either party against the other, whereby fraud is made to recoil and re-act upon the guilty perpetrator, and by withholding from the guilty party the fruits of his iniquity, men are deterred from the commission of fraud. If before we apply the rule, we must first gauge and measure the intelligence and moral senses of the parties in every case being competes mentis, in order to ascertain their equality or inequality as moral and intelligent agents, and then hold that the maxim is only applicable where the parties are exactly equal in .their mental and moral attributes, it would amount to a total abrogation of the maxim ; for in that sense there would never be a case of par delictum. I am satisfied, if this be a fraudulent transaction, it is a case of par de-lictum in the legal proper sense of the maxim, and am therefore for reversing the decree of the Circuit Court with costs of appeal, and for dismission of the bill, but without costs to either party: i. e. each party paying his own costs.
FIELD, P.
From the pleadings and evidence in the cause, it is clearly shewn, that the sale of the property by Elliott to Smith, and the giving of the bond by Smith to Elliott for the payment of the purchase money, taken ^'altogether, was a mere contrivance between Elliott and Smith (both of whom were in a competent state of mind, at the time, to make a valid contract), to place the property of Elliott beyond the reach of his creditors; that it was not considered as between them, or intended to be, a real transaction, but a mere sham, unless, as I believe was the fact, it was the intention of Smith, from the beginning, to prove false to Elliott, and hold on to the property without paying anj^thing for it. Taking for the present this to be the whole case, had Elliott any right to claim of a court of equity a decree to rescind the contract and to have the property restored to him? Where parties are concerned in illegal or fraudulent arrangements like this, they are not entitled to relief in equity. In such cases the court, applying the maxim in pari delicto potior est conditio defendentis aut possidentis, will dismiss the bill, and leave 'the parties in the situation in which they have placed themselves, by their contract. The possession of the property under the contract, or the presence of the legal title to it, gives the right. There are cases in which a particeps criminis may go into a court of equity and obtain relief, by having the contract set aside and his property restored to him, but they are cases in which, although the parties are in delicto, the application of the maxim would not effect its purpose.
The maxim does not apply to cases of contracts, or arrangements made in violation of the policy of the common law or a public statute, such as marriage, brokage bonds, or bonds or conveyances made upon usurious or gambling considerations. In such cases relief is given in aid of public policy, by depriving the defendant of the enjoyment of his unlawful contract, and all its advantages. The interference is not for the sake of the party plaintiff, but for the public, and therefore it is not material to enquire into the degrees of the guilt of the parties. Whether the plaintiff’s guilt be less than the guilt of the defendant, or whether it be equal or more, the relief asked for is granted in order *to deprive the defendant of the fruits of his contract, and thereby lessen the temptation to enter into such contracts. These are cases in which the public at large is concerned, and are to be condemned on considerations of public good.
There are other contracts, concerning the property of individuals only, in which the parties are in delicto, to which the maxim will, not be applied. But they are cases, such as Austin v. Winston, 1 Munf. 33, in which, from the peculiar condition of the plaintiff and the attendant circumstances, the court can, with propriety, and for the furtherance of justice, so far excuse the delinquency or guilt of the plaintiff, as to exempt him from the application of the maxim, “in pari delicto,” &c. In these cases, the plaintiff is not to be regarded as having given his free, unbiased consent to the contract. He is relieved upon the ground that the contract is not strictly a valid contract, because the mind and will of the plaintiff have not sanctioned it. And in contracts of this sort, it is likewise not material to inquire into the degrees of guilt of either party; for whether he be more or less guilty than the defendant, the contract is alike defective for the want of free mental sanction. The case of Austin v. Winston, was considered by the court *573 as a case of this sort. It will appear from the able and lucid opinion of Judge Roane, in that case, that he placed the plaintiff’s right to recover upon the ground that Winston, from his embarrassed condition and dread of Austin, his creditor, had been induced, through the influence and representations of Austin, to give his consent to Austin’s proposition, by which Winston’s creditors were to be defrauded, hindered and delayed in the recovery of their debts. Judge Roane said: “For a contract to be binding, the parties must be free; and that no man can be considered particeps criminis in a transaction, unless he entered into it freely; and it is a general principle, that the doctrine of young heirs is extended to all persons, the pressure of whose wants may be considered as obstructing *the exercise of their judgment. ” He further said: “There can be no fraud which merits nhe reprobation of a court of equity, unless it be entered into freely and mala fide.” Judge Green, in Starke’s ex’rs v. Littlepage, 4 Rand. 371, remarked, that Judge Roane, in Austin v. Winston, thought that relief should be given to Winston, upon the ground that Austin, the creditor, his debtor, Winston, being in distressed circumstances, had used his power over him to induce Winston to unite in the fraud. Whether the facts of Austin v. Winston justified the application of Judge Roane’s opinion to that case or not, we need not inquire into. The principles of his opinion are unquestionably sound, and should be the rule of decision in all cases where, from undue influence, or otherwise, the contract in question is to be regarded as deficient in that essential ingredient— the consent of both parties. If Elliott is entitled to be relieved in this case, it is on this principle only, to wit: the want of consent to the contract with Smith.
Ret us next enquire whether he has freely contracted with Smith or not, or rather whether he did freely, and without improper influence, enter into the arrangement for the sale of his property to Smith. It is alleged that he was a man of weak mind, subject to intoxication, and that Smith supplied him with intoxicating liquors and made him drunk, and in that condition prevailed on him to enter into the arrangement. It is proved that Elliott was an illiterate man, much addicted to habits of intoxication, but, when sober, competent to make a valid contract. He was a man of weak mind, below mediocrity ; yet he was by many of his acquaintances regarded as a man possessing an ordinary share of understanding, and capable of making contracts and attending to his own business. He had been called upon to perform the duty of dividing estates; had been appointed surveyor of the road; and had been called on, and had given, evidence as a witness in a very important case, in which he had given testimony relative to occurrences of many ^years’ standing; and the testimony he gave on the occasion was clear and distinct, and so much confided in by the jury, that it became, to a considerable extent, the basis of their verdict. There was no connection, no relation of confidence existing between him and Smith. They were strangers in blood, and their relations had not been altogether kind and friendly, but rather the reverse at one time. It does not appear that Smith had ever supplied Elliott with intoxicating drink, or that he was drunk when he executed the deed. On the contrary, it is proved that he was sober when he acknowledged the deed, and was not then stupid from the effects of previous intoxication. He was in his right mind at that time. Smith was not present when the deed was acknowledged and attested. Elliott carried the deed to the witnesses, acknowledged it before them, and they attested it, after first reading it over in his presence and hearing. After this was done, Elliott often spoke of the transaction in terms of approval, and acknowledged that Smith had paid up all the motley. This acknowledgment was not true. It was made with the same fraudulent purpose which had, in the first instance, induced him to enter into the arrangement of conveying the property to Smith to defeat the claims of creditors. There is no proof in the cause to show that Smith, at any time, proposed the arrangement, or persuaded Elliott to enter into it. Nor is there a single fact proved in the cause to warrant an inference that Smith, at any time, or in any way, exercised over the mind of Elliott any undue influence, except such as may be supposed to arise from the fact of Elliott’s having conveyed his whole estate to a stranger, without consideration. Eor I do regard the bond as a blank paper, having become so (if it ever had been delivered as a deed) by Elliott’s acknowledgments of having received payment in full.
Elliott thought he had been cheated by Powell, of whom he had purchased an old boat; and wishing to defeat Powell’s claim for the x>urchase money, to accomplish that object, entered into the arrangement with *Smith, and conveyed to him, at a price named, his whole estate, real and personal. Eor the payment of the price named he took Smith’s bond, to give to the transaction a fair color; and after-wards, without having received payment of the bond, he verbally, and in the form of credits and a receipt, admitted that the bond had been paid off, when, in truth, it had not been paid, as is made manifest by Smith’s answer and other circumstances in the cause. Although the main object and purpose of the deed was to defeat the debt of Powell, its fraudulent operation, was not limited to that debt. It extended to Clark’s debt, which was a just debt, and was embraced in the same security which provided for the payment of Powell’s debt, and it necessarily extended to all the other debts of Elliott; and its tendency was to hinder and delay all the creditors of Elliott in the recovery of their debts. Elliott did all that he could do, to carry out and accom *574 plish the fraudulent purpose of the arrangement made with Smith. He declared it to be fair; admitted that Smith had paid up all the purchase money, though Smith swears that /'lOO of it had been left in his hands. Elliott takes the oath of insolvency ; surrenders neither the property conveyed to Smith, nor his equity of redemption in it, nor the debt due from Smith upon the purchase, nor does he surrender the money which he pretended he had received of Smith for the property. Under all these circumstances, where is the authority for saying that Elliott has not freely assented to the agreement with Smith, and is therefore entitled to have the contract rescinded, and the property restored to him? There is none, nor should the contract be set aside on grounds of public policy. The statute declares all such contracts to be binding on the parties.
Elliott’s contract with Smith was an imprudent and a ruinous one to him — so much so as to excite a feeling of sympathy for Elliott, and disgust towards Smith; but in the language of Judge Allen (Greer v. Greer, 9 Grat.), “it is not the propriety or impropriety of the *disposition, but the capacity to make it, and the fact that it was made freely, with the full assent of the grantor, tha,t must control the judgment of the court.”
Eor the reasons above assigned, I am of opinion that the decree should be reversed and the bill dismissed.
The decree of the court is, that the decree be reversed with costs, and that the bills be dismissed, but without costs.
TYEER, J.
Erom the view I have taken of the facts and circumstances in this cause, X am constrained to differ from my brothers in the conclusion to which their investigation of this case has conducted them; and agreeing mainly with the Judge of the Court below in the opinion pronounced by him, and which is a part of the record, I shall add but little to what he has said. I am not satisfied, from the evidence in this -case, that the plaintiff in the Court below executed the conveyances to the defendant with the intent to defraud his creditors. He was, in my opinion, manifestly, a very weak-minded man, and rendered still more so by intemperance. About the date of the transactions under consideration, he was a hopeless and abandoned drunkard; ’ unable to write or to read writing; liable to be imposed on and defrauded by those he confided in, and too utterly stupid and illiterate _ to conceive or consummate a plan by which he might protect his property from the arts of others, or cloak it from its liability to his creditors; and if we take the allegations in his original bill as true, (which seems tó be the source from which is inferred a fraudulent intent in executing the conveyances to the defendant), so far, in my opinion, from its shewing a fraudulent intent on his part, it shews his object and aim were to prevent the consummation of a fraud which had been attempted on him; and it proves nothing more than this: that the plaintiff, influenced by these considerations, being utterly ignorant himself as to such matters, applied to the defendant for aid and advice, *relying on his friendship and superior knowledge to shield him from this impending difficulty. And the defendant promising to protect him from imposition, Elliott thenceforth submitted himself to the will of the defendant, and became a blind and passive instrument in the hands of Smith, whereby he was enabled to get possession of every particle of property that Elliott had on earth, and by the same contract converted Elliott into an operative on his farm.
I come to this conclusion from the evidence in the record; and if I understand aright the principles and practice of courts of equity in the investigation of fraudulent transactions, while they will not arbitrarily presume fraud, yet it is equally clear, they will infer judicially a fraudulent purpose from suspicious circumstances, well corroborated and not rebutted, though such circumstances fall far short of legal proof. Chesterfield v. Janssen, 2 Ves. sen. 155. And where fraud is charged, a court of equity will enter into all the circumstances and merits of the case, in order to come at the fraud. Man v. Ward, 2 Atkins, 229. Fraud, too, said Savage, C. J., in the Court of Errors, on an appeal from chancery in 3 Wendell 626, is often the subject of enquiry in courts of law as well as equity; there is, however, this difference, that at law, fraud must be proved — it must be what Eord Hardwicke calls “dolus malus” — actual fraud, arising from facts and circumstances of imposition. At Law, the contract of every man, who is compos mentis, is binding, and cannot be avoided in general without proof of actual fraud in obtaining it. Neither will a court of equity measure the extent of men’s understandings, and say that there is an equitable incapacity, where there is a legal capacity. Yet, if a weak man gives a bond for a pretended consideration, when, in truth, there is none, equity will relieve against it. (3 P. Wms. 130.) Eraud, too, is sometimes apparent from the intrinsic nature of the contract; it may be such as no man in his senses, and not under a delusion, would make, *and such as no man, would accept, which is Eord Hard-wicke’s second class of frauds; and his third is, that which may be presumed from the circumstances and condition of the contracting parties, (Chesterfield v. Janssen, 2 Ves. sen. 155.)
Apply these tests to the defendant’s conduct and acts, and what might not a court .of equity infer, bearing in mind the cir-pumstances and condition of the contracting parties, judicially against him? We have his answer on oath stamped with falsehood on its face, filled with inconsistencies, prevarications and contradictions, accompanied by an exhibition of false receipts, signed no doubt by the plaintiff, but signed, like the conveyances which *575 transferred Elliott’s property to himself, without Elliott’s understanding- the use that was to be made of them, or the consequences, that were to flow from them. A defendant, who stands in a court of equity in a worse condition, than if the plaintiff's bill had been taken pro confesso, who, in attempting to deny the case made b3r the plaintiff’s bill, confounds himself, and renders it highly and morally probable that the truth is with Elliott rather than with him, whose sworn statements, added to the other facts iu this cause, would induce a majority of this Court (I am authorized to say) to annul this contract, and restore this property, if they did not think they were prevented by the imputation of fraudulent intent on the part of Elliott. X go farther, and say, the evidence not only justifies me in pronouncing the conduct of Smith sufficiently fraudulent to vacate this contract, but that it justifies a court of equity in treating Elliott as the dupe of Smith, who signed the conveyances at Smith’s bidding, without the intention to defraud any one of what was justly due him ; and that Smith concocted and consummated the whole scheme; prepared the conveyances, got Elliott to sign them, sent him off to have them witnessed, Elliott being a mere automaton in the hands of Smith to play out this iniquitous game; and that, under such circumstances, the feeble and dubious ^invocation of legal policy, to appljr the maxim, in pari delicto potior est conditio defendentis, is hushed and silenced in the louder and loftier appeal of natural justice against the machinations of fraud and falsehood. I am, therefore, opposed to a reversal of the decree and a dismissal of the bill; but as that is to be the decree to be rendered in this case, I have deemed it unnecessary to consider any matter of detail in the cause.
Note by Repobteks. — In the case of Deatly’s heirs v. Murphy et ais., 3 A.K. Marsh. 472, itwasheld: "A chancellor will not set aside a contract of sale, made to defeat creditors where there is an equality of guilt, between vendor and vendee; hut if the vendee avails himself of his influence over the mind of a weak, confiding man, to induce him to sell with such a view, there is no equality of guilt, and such contract will he vacated.” And in delivering the opinion of the court, Mills, J., said: “Among the numerous registers of guilt, which courts of j ustice are frequently compelled to make, hut few can he found of a color more dark, a conduct more unfeeling and evil, than that which the proof in this cause discloses against the defendant Murphy. In such circumstances we must inquire whether there are any legal bars in the road of recovery, and whether Deatly’s conduct was as equally base as that of Murphy, as to prevent his representatives from recovery in this suit.” The judge then states the circumstances of the particular case at large, and afterwards proceeds thus: “Can any relief be granted against the contract under these circumstances? We recognize the rule recognized by the court below, that equity will not relieve against or enforce a contract made to defraud creditors, or third persons; not because the defendant has merit in his claim, but barely because he has the attitude of a defendant. In such case the maxim is, in pari delicto melior est conditio defendentis. But this is a case where the party against whom relief is sought, has fraudulently induced the party seeking relief, to attempt a fraud by using his influence, exercising his vast ascendancy, arising both from confidence and dependence, making use of dangers not existing, to induce Deatly to dispose of his property, when it was not subject to the execution at all, even if it was not then discharged. In such a case Deatly never could be in pari delicto. Murphy was the origin and instigator o£ the crime. Deatly could not be a free agent in doing such a useless act, and so far as he consented, it was under a belief of a falsehood, invented by Murphy. We are unwilling to extend the rule so far as to cover such a fraud, devised and completed by the defendant. It is enough to afford such defendants the protection of the rule, when they *are not more guilty than the complainant. The Court of Appeals in Virginia, in the case of Winston’s adm'x v. Austin’s ex’x, enforced a con tract made between a debtor and creditor to defraud other creditors, 1 Hen. & Munf. 33. Although we might hesitate to go as far as that case has gone, in decreeing the benefit of a contract, yet we cannot in this case, which is much stronger, refuse to set the contract aside.” And so the court reversed the decree of the court below, by which relief had been reí used.