# CASES DECIDED

## IN THE

# Supreme Court of Appeals

## OF VIRGINIA.

### Wytheville.

CARNAGIE TRUST CO. AND OTHERS v. SECURITY LIFE INSURANCE.

CO. OF AMERICA AND OTHERS.

June 9, 1910.

Absent, Harrison, J.

1. CORPORATIONS—*Voting Trust Agreement—Consideration—Mutual Promises.*—The mutual promises of the parties to a voting trust agreement (created by a deposit of stock certificates with trustees for a given time, with the right and duty of the trustees to vote the same) constituted a sufficient consideration to support the agreement. The promise of each is the consideration for the promise of the other.

2. CONTRACTS—*Consideration—Fraud—Public Policy.*—If an unsealed agreement be without consideration it is not enforceable. If it be procured by fraud, or is being used to promote a fraudulent purpose, it is voidable, though founded on a valuable consideration. If it be contrary to public policy it is void, though resting on a valuable consideration.

3. FRAUD—*Parties in Pari Delicto—Enforcement of Rule.*—The rule "*in pari delicto*" operates only in cases where the refusal of the courts to aid either party frustrates the object of the transaction and takes away the temptation to engage in contracts *contra bonos mores*, or violating the policy of the law. If it:

be necessary, in order to discountenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done though both parties are *in pari delicto.*

4. PROPERTY—*Elements of Ownership—Shares of Stock.*—In the right of property there are three elements: The legal title to the property, the beneficial interest in it, and the right of control over it; and so a share of stock is the right which its owner has in the management, profits and ultimate assets of the corporation.

5. CORPORATIONS—*Voting Trust Agreements—Validity—Restraint of Trade.*—Voting trust agreements are not *per se* illegal, and, so far from exercising an injurious influence upon trade, they have added efficiency, economy and stability to the administration of corporate affairs.

6. CORPORATIONS—*Voting Trusts—Severance of Title and Ownership— Property of Trustee—Nature of Trust.*—The right to vote the stock of a corporation, to manage and control its affairs, and to direct its policies, is, in and of itself, a valuable right of property, and a trust under which the trustee holding the legal title has the right and is charged with the duty of voting stock is an active and not a passive or dry trust. The ownership of the stock is not "divorced" from the beneficial interest in it.

7. CORPORATIONS—*Voting Trust Agreements—Validity—Public Policy— Statutes.*—In the absence of any element of oppression, immorality, fraud, or bad faith actuating the agreement, or of a purpose to do any act beyond the limits of the corporate authority of the company, or to secure an illegitimate or improper advantage to the detriment of the interests of the company and of the other stockholders, a voting trust agreement by which certain subscribers transfer the legal title to their stock to trustees for twenty-five years. to be voted only by them or a majority of them "in order to promote and protect the value of the stock and to secure the satisfactory management" of the company, is not contrary to the public policy of this State. No case has so held, and no statute has so declared. The statutes of this State do not inhibit or condemn the separation of the ownership of stock from the right to vote it, and the legislature while dealing with the subject of voting stock, and regulating the right to vote it under many varying aspects and conditions of ownership and representation (Code, 1904, sec. 1105-e, clauses 20, 21, 22, 23) has given no hint or suggestion that a voting trust agreement is in violation of public policy.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for the defendants. Complainants appeal.

*Affirmed.*

The opinion states the case. The prayer of the bill, after naming parties and asked for process, is:

"2. That the said voting trust agreement of a certain date, to-wit: February 1, 1907, be annulled and the said agreement be required to be given up for cancellation; and that the powers, rights and privileges granted the said Joseph E. Otis, W. O. Johnson, W. T. Durbin, Patrick J. Kieran and Edward E. Duff, their successor or successors, appointee or appointees, under said voting trust agreement, be revoked and annulled.

"3. That the said defendant, the Security Life Insurance Company of America, its officers, agents and stockholders, be restrained by injunction of this honorable court from transacting any and all business of said corporation, or its stockholders, at any annual, adjourned annual, special or other meeting of the stockholders of said company, and that the said Joseph E. Otis, W. O. Johnson, W. T. Durbin, Patrick J. Kieran and Edward E. Duff, their successor, or successors, appointee, or appointees, be enjoined and restrained from voting, at any annual, or other, meeting of the stockholders of the said company, the thirty thousand shares of stock, or any part of the same, or exercising any other powers, rights or privileges included in and under the said voting trust agreement, until the rights of your orators to have said voting trust agreement cancelled and annulled shall have been determined and adjudicated by this honorable court.

"3½. That the individual defendants, or a majority of them, trustees under said voting trust agreement, be required to surrender the certificates of stock now held by them, and

4 Carnagie Trust Co. *v.* Security Life Ins. Co., 111 Va. 1.

Statement.

standing in their name to said defendant insurance company, or its proper officers, to be erased and cancelled, and that said defendant company or its proper officers be required to vacate the cancellation of the certificates of stock originally deposited with said company by said defendant trustees and turn over the same to your complainant properly endorsed, or else that said officers of said insurance company, after the receipt of said certificates of stock from said trustees, be required to issue to your complainants new certificates of stock representing an equal number of shares as the number represented by the voting trust certificates held by your complainants.

"4. And your orators may have such other, further and general relief in the premises as the nature of their case may require and to the court may seem meet."

The voting trust agreement referred to in the opinion of the court is as follows:

"This agreement, made this first day of February, 1907, by and between Jos. E. Otis, W. O. Johnson, W. T. Durbin, P. J. Kieran and Edward E. Duff, hereinafter called "trustees," parties of the first part, and the several persons whose names are hereunto subscribed, hereinafter called "subscribers," parties of the second part, Witnesseth:

"Whereas, the trustees have agreed to purchase 30,000 shares of the capital stock of the Security Life and Annuity Company of America, hereinafter for convenience termed security company, all of which stock has been issued and now stands on the books of said company in the name of the trustees, and

"Whereas, said subscribers have arranged to procure an interest in said shares so purchased, as hereinafter provided, and

"Whereas, all parties hereto, in order to promote and protect the value of said stock, and to secure the satisfactory management of said security company for a period of years,

are desirous that the title to all of said stock shall at all times stand on the books of said security company in the name of the trustees during the continuance of this agreement, and that said stock shall be held together in one block and voted as the trustees, or a majority of them, may determine, for the period of twenty-five (25) years from February 1, 1907, and

"Whereas, said sale of said interest in said stock to the subscribers has been made by the trustees, and accepted by said subscribers, upon the express condition that the same should not vest in the subscribers any right to vote said stock, during the period of this agreement, or any title thereto, except such rights as are in terms conferred by the trustees' certificates, hereinafter provided to be issued by the trustees, and

"Whereas,, said Otis, Johnson and Durbin, the three trustees first named above, now hold as trustees under a trust agreement, dated June 14, 1906, certain shares of the capital stock of said security company, and have issued under that trust agreement certain trustees' certificates to various parties, and

"Whereas, the said Otis, Johnson and Durbin have agreed to procure the exchange of the trustees' certificates issued by them under said agreement of date June 14, 1906, in exchange for the trustees' certificates calling for a like amount of stock to be issued as hereinafter provided.

"Now, therefore, it is agreed by and between the parties hereto in consideration of the premises, and of their mutual covenants each with the other, as follows:

"First: Each subscriber hereto, or to any counterpart hereof, agrees to pay to the trustees upon the signing of this agreement the amount set opposite his respective name, and for each twenty-five ($25.00) dollars so paid, such subscriber, his legal representative or assigns, shall be entitled to receive at the expiration of this agreement, one share of the capital stock of said Security Life and Annuity Company of America. The sums paid by the subscribers shall be used and re-

tained by the trustees as their own property for the purchase price of the trustees' certificates to be issued to subscribers as hereinafter provided. Provided, however, that the subscribers to the trust agreement, dated June 14, 1906, who become parties hereto as provided in the succeeding clause hereof, shall not be required to pay any money to the trustees, the surrender of their trustees' certificates issued under said agreement of June 14, 1906, being accepted by the parties hereto in lieu of other payment.

"Second: The subscribers to the trust agreement, dated June 14, 1906, hereinbefore referred to, may become parties hereto by signing this agreement and by surrendering the trustees' certificates held by them under said trust agreement of date June 14, 1906, and upon such signature and surrender such parties shall be entitled to receive trustees' certificates issued hereunder as hereinafter provided, setting forth the numbers of shares of stock of said security company to which such subscribers will be entitled at the expiration of this agreement, which shall be the same number of shares as expressed in the trustees' certificates issued under said agreement of June 14, 1906.

"Said Otis, Johnson and Durbin, upon the surrender of all of the trustees' certificates issued as above described, under said agreement of June 14, 1906, will transfer all the shares represented in such certificates to the trustees herein named.

"Third: Upon full payment by each subscriber of the amount of his subscription, a certificate shall be issued to him by the trustees, setting forth the number of shares of stock of said Security Life and Annuity Company of America to which such subscriber will be entitled at the expiration of this agreement, which certificate shall be in substantially the following form, and which is herein referred to for convenience as a trustees' certificate:

" 'No........                            ........Shares.

" 'Trustees' Certificate under Agreement dated February

1, 1907.

" 'Security Life and Annuity Company of America.

" 'This is to certify that on the 1st day of February, 1932,............ will be entitled to receive a certificate, or certificates, for............full paid shares of the par value of ten dollars ($10.00) each, of the capital stock of the Security Life and Annuity Company, and in the meantime to receive payments equal to the dividends, if any, collected by the undersigned trustees, or their successors, upon a like number of such shares standing upon the books of said company in the name of the said trustees, or their successors, less expenses, if any, incurred by said trustees, under the agreement hereinafter referred to, and until after the actual delivery of such stock certificates the said trustees, or their successors, shall possess, and shall be entitled to exercise all rights of every name and nature, including the right to vote with respect to any and all such stock, it being expressly stipulated that no voting right passes by or under this certificate, or by or under any agreement, expressed or implied. This certificate is issued under and pursuant to the terms of a certain agreement dated February 1, 1907, entered into by and between Joseph E. Otis, W. O. Johnson, W. T. Durbin, P. J. Kieran and Edward E. Duff, as trustees, of the first part, and sundry other subscribers to said agreement, of the second part. This certificate is transferable only on the books of the undersigned trustees by the registered holder either in person or by attorney, duly authorized according to the rules established for that purpose by the trustees, and on surrender hereof; and, until so transferred, the trustees may treat the registered holder as the owner hereof for all purposes whatsoever, except that the delivery of stock certificates hereunder shall not be made without surrender hereof.

" 'In witness whereof, the said trustees have executed this certificate this.......... of................., A. D., 190....
" 'Joseph E. Otis,
" 'W. O. Johnson,
" 'W. T. Durbin,
" 'P. J. Keiran, and
" 'Edward E. Duff,
" 'Trustees.

" 'Countersigned:
" '..............Trustee.'

"Said trustees' certificate shall be transferable on the books of the trustees by the holder thereof in person or by attorney upon surrender thereof properly endorsed. Upon such assignment and surrender a new trustees' certificate shall be issued to the transferee by the trustees, and the person accepting such assignment, or accepting such new certificate, shall be bound by the terms of this agreement as fully to all intents and purposes as if he signed the same. Such trustees' certificates may bear the facsimile signature of said trustees, provided they are countersigned by one of the trustees, or their successors.

"Fourth. On the first day of February, 1932, upon surrender of any trustees' certificate then outstanding hereunder, the trustees will, in accordance with the terms thereof, deliver corresponding certificates or shares of the capital stock of said security company, such delivery to be made only out of, and from, certificates of stock heretofore or hereafter issued to, or standing in the name of, the said trustees or their successors.

"Fifth. Should any dividends be paid to the said trustees or their successors, on the shares of stock standing in their names, they shall, within a reasonable time after the receipt by them of such dividends, distribute the moneys so received by them to the holders of the trustees' certificates

issued hereunder in proportion to the number of shares named in the certificate or certificates of each holder. Provided, however, that the trustees may retain out of any such dividends any necessary expense to which they may be put by reason of the trusteeship hereby created. In making payment of such dividends the trustees, or their successors, shall be entitled to treat the persons in whose names such trustees' certificates stand upon the books of the trustees, as the owners thereof for all purposes, and shall not be affected by any notice to the contrary.

"Sixth. Each of the said trustees shall have power to appoint his own successor in trust, and to make such appointment at any time, either by deed or by will, and each successor in trust shall in turn have the same power of appointment of his successor. Such appointment shall become effective immediately upon the death, resignation, insanity or permanent removal from the United States of such trustee, and any such appointment may be revoked by the person making the same at any time prior to its actually becoming effective. Wherever in this agreement the trustees are referred to, such terms shall be held to embrace the trustees for the time being in office as such, whether original or successor.

"Seventh. In case of the failure of either of said trustees, or their successors, to appoint a successor in trust, then, upon the death, resignation, insanity, or permanent removal from the United States of such trustee or successor in trust, his successor shall be appointed by an instrument in writing, signed by a majority of the remaining trustees hereunder, then in office, and in case they are unable to agree upon such successor in trust, the appointment shall then be made by the person who shall hold the office of president of the Western Trust and Savings Bank of Chicago, Illinois, or its successor, or assigns.

"Eighth. Nothing herein contained shall constitute the

parties hereto partners, but this agreement shall bind and inure to the benefit of the trustees, and each of them, and their successor, or successors, and each of them, in the trust hereby created, and shall bind and inure to the benefit of the subscribers hereto and their legal representatives and assigns.

"Ninth: The trustees may, in their discretion, select some bank in Chicago to act as transfer agent for the trustees' certificates herein provided for. And in that event, no such trustees' certificate shall be valid until countersigned by such transfer agent.

"Tenth: Said trustee, or their successors in trust, from time to time, shall vote the shares of stock embraced in this agreement at all meetings, general or special, of the stockholders of said Security Company upon any matter, proposition or thing which may be submitted to any such meeting, and they shall possess in that respect the same powers as though they were the sole, unrestricted owners of such stock. The trustees may use said voting power in the election of any such trustees as officers or directors of said security company.

"The trustees shall not be liable for mistakes of law or fact, nor for errors of judgment in using such voting power, or otherwise in connection therewith, except for their own individual misfeasance, and no trustee shall be responsible for the acts or omission of any other trustee hereunder. All action to be taken by, and questions arising between the trustees from time to time, shall be determined by the decision of the majority of those then acting as trustees, either at a meeting, or by writing, with or without meeting, and in like manner the trustees may establish their rules of action.

"Any trustee hereunder may vote in person or by proxy to any other person, whether or not a trustee, and a proxy in writing signed by a majority of the trustees shall be sufficient authority to the person named therein to vote the stock held by all the trustees hereunder at any meeting, general

or special, of the stockholders of the security company. Any proxy executed by the direction of a majority of the trustees, as herein provided, may be executed by such majority in the names of all the trustees.

"Upon the succession to office of a successor to any trustee hereunder, a majority of the trustees in office at the time of such succession are hereby irrevocably vested with full power should they deem it necessary or advisable to exercise it, to assign the shares of stock covered by this agreement to the trustees then in office, including such successor, to the end that a new certificate for such stock may be issued in the names of the trustees at that time duly appointed hereunder.

"Eleventh: An original hereof shall be signed by the trustees and retained by them, and counterparts may be signed by the subscribers, but all together shall be taken and deemed one original instrument, and held by the trustees.

"In witness whereof, the trustees, parties of the first part hereto, have subscribed an original hereof, and the subscribers, parties of the second part hereto, have subscribed said original, or counterparts thereof as of the day and year first above written.

*William A. Keener*, *Wyndham R. Meredith* and *Coke & Pickerell*, for the appellants.

*Montague & Montague*, for Security Life Insurance Co.

*Braxton & Eggleston* and *Pam & Hurd*, for the Trustees.

KEITH P., delivered the opinion of the court.

The Carnegie Trust Company and Robert J. Davidson filed their bill in the Chancery Court of the City of Richmond, from which it appears that the Carnegie Trust Company is the holder and owner of certain voting trust certificates, representing 12,200 shares of the capital stock of the Security Life

Insurance Company of America, and 188 shares of the capital stock of that company, and that Robert J. Davidson, trustee of the Guarantee Title and Trust Company of Pittsburg, is the holder of voting trust certificates representing 12,667 shares of the capital stock of said Security Life Insurance Company, a corporation organized and existing under the laws of the State of Virginia, with its principal office in the city of Richmond and its chief executive offices in the city of Chicago, State of Illinois; that the principal business of the insurance company is to do a general life insurance business; and that there have been legally issued and are now outstanding fifty thousand shares of its capital stock, each of the par value of ten dollars. The bill then sets out in detail the negotiations entered into between certain named persons which resulted in what is known as the "February Agreement," from which it appears that, by an agreement made the 1st day of February, 1907, between Otis, Johnson, Durbin, Kieran and Duff, parties of the first part, who are named as "trustees," and other parties of the second part, who are named as "subscribers," the trustees have agreed to purchase 30,000 shares of the capital stock of the Security Life Insurance Company of America, all of which stock had been issued and stands on the books of the company in the names of the trustees; "and whereas said subscribers have arranged to procure an interest in said shares so purchased, as hereinafter provided, and

"Whereas, all parties hereto, in order to promote and protect the value of said stock, and to secure the satisfactory management of said security company for a period of years, are desirous that the title to all of said stock shall at all times stand on the books of said security company in the name of the trustees during the continuance of this agreement, and that said stock shall be held together in one block and voted as the trustees, or a majority of them, may determine, for the period of twenty-five (25) years from February 1, 1907, and

CARNAGIE TRUST CO. *v.* SECURITY LIFE INS. CO., 111 VA. 1. 13.

Opinion.

"Whereas, said sale of interest in said stock to the subscribers has been made by the trustees, and accepted by said subscribers, upon the express condition that the same should not vest in the subscribers any right to vote said stock, during the period of this agreement, or any title thereto, except such rights as are in terms conferred by the trustees' certificates hereinafter provided to be issued by the trustees, and

"Whereas, said Otis, Johnson and Durbin, the three trustees first named above, now hold as trustees under a trust agreement, dated June 14, 1906, certain shares of the capital stock of said security company, and have issued under that trust agreement certain trustees' certificates to various parties, and

"Whereas, the said Otis, Johnson and Durbin have agreed to procure the exchange of the trustees' certificates issued by them under said agreement of date June 14, 1906, in exchange for the trustees' certificates calling for a like amount of stock to be issued as hereinafter provided;

"Now, therefore, it is agreed by and between the parties hereto, in consideration of the premises, and of their mutual covenants each with the other, as follows:

"First: Each subscriber hereto, or to any counterpart hereof, agrees to pay to the trustees upon the signing of this agreement the amount set opposite his respective name, and for each twenty-five ($25.00) dollars so paid, each subscriber, his legal representative or assigns, shall be entitled to receive at the expiration of this agreement, one share of the capital stock of said Security Life and Annuity Company of America. The sums paid by the subscribers shall be used and retained by the trustees as their own property for the purchase price of the trustees' certificates to be issued to subscribers as hereinafter provided. Provided, however, that the subscribers to the trust agreement, dated June 14, 1906,

who become parties hereto as provided in the succeeding clause hereof, shall not be required to pay any money to the trustees, the surrender of their trustees' certificates issued under said agreement of June 14, 1906, being accepted by the parties hereto in lieu of other payment." It then provides that the subscribers to the trust agreement of June 14, 1906, may become parties to the agreement of February 1, 1907, by signing the last-named agreement and surrendering the trustees' certificates held by them under the agreement of June 14, 1906, and shall then be entitled to receive trustees' certificates issued under the agreement of February 1, 1907, in strict accordance with its terms, it being expressly stipulated upon the face of each certificate, that "no voting right passes by or under this certificate or by or under any agreement, expressed or implied. This certificate is issued under and pursuant to the terms of a certain agreement dated February 1, 1907, entered into by and between Joseph E. Otis, W. O. Johnson, W. T. Durbin, P. J. Kieran and Edward E. Duff, as trustees, of the first part, and sundry other subscribers to said agreement, of the second part. This certificate is transferable only on the books of the undersigned trustees by the registered holder either in person or by attorney, duly authorized according to the rules established for that purpose by the trustees, and on surrender hereof; and until so transferred, the trustees may treat the registered holder as the owner hereof for all purposes whatsoever, except that the delivery of stock certificates hereunder shall not be made without surrender hereof." Provision is then made in the trust agreement for the termination of the trust in 1932 upon the expiration of twenty-five years, and in the meantime for filling any vacancy that may occur among the trustees or their successors.

By clauses nine and ten of the "February Agreement" it is provided, (clause nine) that "The trustees may, in their discretion, select some bank in Chicago to act as transfer agent for the trustees' certificates herein provided for. And in that

event, no such trustees' certificates shall be valid until countersigned by such transfer agent;" and (clause ten) that "Said trustees, or their successors in trust, from time to time, shall vote the shares of stock embraced in this agreement at all meetings, general or special, of the stockholders of said security company upon any matter, proposition or thing which may be submitted to any such meeting, and they shall possess in that respect the same powers as though they were the sole, unrestricted owners of such stock. The trustees may use said voting power in the election of any such trustees as officers or directors of said security company."

The bill does not charge that the agreement dated February 1, 1907, and filed as an exhibit with the bill, was procured by fraud; it does not charge that it is fraudulent upon its face; and there is no charge of any fraudulent purpose or act upon the part of the trustees or any other person, natural or artificial, who is made a party to the bill. The true purpose and sole object of the bill is to attack the "February Agreement" as creating what is known as a voting trust, upon the grounds, (1) that the agreement was without consideration, and (2) that all such contracts are void as against the laws of this Commonwealth, which, from motives of public policy, will not tolerate a separation of the voting power from the beneficial ownership of stock, but will set the seal of disapprobation upon all attempts to accomplish that result. This being the real issue presented by the pleadings, as we understand them, we have not deemed it necessary or proper to discuss the minor differences existing between the appellants and the appellees as to what are to be deemed the facts proved as presented by the bill and answer, as we do not conceive them to be material to the questions to be discussed and decided.

We are of opinion that a sufficient consideration to support the "February Agreement" is to be found in the mutual promises which it discloses, the promise of each being the consid-

eration for the promise of the other. Such a consideration, as its very terms import, will support not only an executed but an executory contract as well. 1 Parsons on Contracts, 464; Machen's Mod. Law of Corp., Vol. 2, sec. 1270.

If the "February Agreement" were without consideration, that of course would end it. Although resting upon a valuable consideration, if it had been procured by fraud, or if it were being used to promote a fraudulent purpose, it would be voidable. But, as we have seen, fraud is neither charged nor proven. If it be contrary to the public policy of the State, it is nevertheless void, though resting upon a valuable consideration.

As we have seen in the statement of the case, each holder of a trustees' certificate issued under the "February Agreement" took it with notice of every essential feature contained in that agreement—took it with notice declared upon the face of each certificate, that it was issued under and pursuant to the terms of a certain agreement dated February 1, 1907; and that it was expressly stipulated that no voting right passed by or under it or by or under any agreement express or implied. If, therefore, the voting trust be unlawful, all who dealt with those certificates were apprised of its illegality, and it might be urged against them with much force that if such transactions involved a wrong they had by their voluntary act become participants in that wrong. But in this case we shall waive all such considerations.

In treating of the rule, *"in pari delicto potior est conditio defendentis,"* this court, in the case of *Harris* v. *Harris' Ex'or*, 23 Gratt. 757, said: "This rule operates only in cases where the refusal of the courts to aid either party frustrates the object of the transaction and takes away the temptation to engage in contracts *contra bonos mores*, or violating the policy of the law. If it be necessary in order to discountenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done though both the parties.

are *in pari delicto.* The party is not allowed to allege his own turpitude in such cases, when defendant at law, or prevented from alleging it when plaintiff in equity, whenever the refusal to execute the contract at law, or the refusal to relieve against it in equity, would give effect to the original purpose, and encourage the parties engaging in such transactions." *Starke* v. *Littlepage,* 4 Rand. 368.

We shall, therefore, place the appellants in the best position it is possible for them to occupy, permit them to assail without limit a transaction to which they were themselves parties, and to defeat, if contrary to public policy, a contract. into which they have voluntarily entered.

We have been referred to no case in this court, and we know of none, in which this question has arisen. It is of the first impression in this Commonwealth.

It cannot be gainsaid that in the right of property there are three elements—the legal title to the property, the beneficial interest in it, and the right of control over it; and this is conformable to the definition of a share of stock, which in 1 Cook on Corporations (6th ed.) sec. 312, is defined as a right which its owner has in the management, profits and ultimate assets of the corporation.

In the certificates under consideration, the management is reserved to the trustees; the profits, after charging them with a just proportion of expenses, pass as dividends to the certificate holders; while the ultimate assets, in this as in other corporations, are only to be distributed and enjoyed when the corporation is terminated.

There are doubtless cases which hold such an agreement as that of February 1, 1907, to be void as against public policy; but in many of them the purpose was unlawful, or there was an effort to achieve a lawful purpose by questionable means.

In *Cone* v. *Russell,* 48 N. J. Eq., at p. 208, 21 Alt. 847, complainants as executors and trustees held certain shares of stock in an incorporated company; defendants held certain other

shares therein, which added to those held by complainants constituted a majority of all the shares. Complainants on the one part and defendants on the other entered into a contract by which complainants agreed to execute, and in pursuance thereof did execute, a proxy, irrevocable for five years, to defendants to vote at all stockholders' meetings upon the complainants' shares; and defendants, in consideration thereof, agreed to so vote said shares as that one of the complainants should be continuously employed as manager of the corporation, at a salary of $2,500 a year. It was held that such an agreement was void because against public policy, and because a breach of trust by complainants. It is not conceivable that any other conclusion could have been reached, without regard to the validity or invalidity of the voting trust.

In the case of *White* v. *Thomas Inflatable Tire Co.*, 52 N. J. Eq. 178, 28 Atl. 75, the contest was upon three grounds—First, that the original contract, by which a minority of stock was given the perpetual right to elect a majority of the directors, and thus control the affairs of the company, was contrary to public policy and, for that reason, void; and, Second, that, conceding the contract to be valid and binding between the original parties so long as only eighty-three *per cent.* of the stock was issued, it nevertheless became nugatory and void as against the holders of the seventeen *per cent.* of new stock as soon as that was issued. In discussing these questions the court said, that it did not find it necessary to determine certain questions bearing upon the first ground of contest stated, which had relation to the transfer of the certificates, because the court had come to the conclusion that the second position taken by the complainants was sound. "The contracts in question were not made a part of the certificate of organization or incorporated into the by-laws. Nor, in my judgment, did they, or could they, be fastened upon, or in anywise affect, the seventeen thousand shares of stock issued directly to the complainants. And I think this is so, whether the complainants

had or had not notice of these contracts, since they did not enter into or form part of the contract between the company and complainants as holders of the new stock. As such holders they were entitled to have the other shares of stock in the company stand upon an equal footing, and to have the affairs of the company managed by a board of directors elected according to law, by a majority of all the stockholders. Unless, as the holders of the new issue of stock, they had such right, they would be deprived of a valuable right belonging to their stock, viz., the right to combine with other stockholders to elect a majority of the directors. In fact, they would be deprived of all voice in the management of the company and of the right which each stockholder has to the benefit of the fundamental and salutary rule that the best interests of the minority are found in a rule by the majority." From the statement of facts it appears, that the negotiations for the purchase of the seventeen thousand shares of stock from the company were carried on by the complainant White, and there was evidence tending to show that before he made the purchase he had notice of the substance of the trust-voting agreement, but this was denied by him. While in the case before us there can be no doubt or question, that whoever took one of the trust certificates took it with full notice of all the conditions and limitations attached to it.

In *Clowes* v. *Miller*, 60 N. J. Eq. 179, 47 Atl. 345, by a pooling agreement certain persons were to hold the certificates of stockholders for two and one-half years, together with proxies authorizing them to vote on any question, and the stockholders by the agreement were not to sell their stock, the object being to finance and complete the enterprise. The court, in holding this agreement valid, suggested, that "no illegal purpose is manifest upon the face of this agreement, nor has any been alleged in the bill. It appears to be consistent with the purposes for which the company was created, and whose continuance appears to be necessary for the advantage

of all who are interested in the development of the property. It is expressly declared to be for the benefit of all who join in it."

In *Chapman* v. *Bates*, 61 N. J. Eq. 658, 47 Atl. 638, 88 Am. St. Rep. 459, it was held that a proxy and power of attorney made by a stockholder in a corporation, giving voting powers and rights to deal with the stock in various ways, and to sell 'and exchange it, and conferring an interest, and, by its terms, irrevocable for a period less than three years, will not be revoked upon a bill filed by the maker for that purpose, unless it appears that the purposes are illegal, or in violation of some statute, or against public policy; and that what are known as pooling agreements are not necessarily illegal, but each case will depend upon the objects to be attained. See also *Chapman* v. *Bates*, 60 N. J. Eq. 17, 46 Atl. 591.

It is impossible to discuss all the cases cited. Some of them are decided upon considerations as to the nature of irrevocable proxies; others rest upon the statute law of the State in which they are rendered; very many rest upon the fraudulent or otherwise objectionable character of the object to be attained; while others, it must be admitted, condemn a trust such as that under consideration as being contrary to public policy and for that cause null and void. In considering the cases, however, and the text-writers who have commented upon them, it is impossible not to be impressed with the change of opinion which has taken place with respect to the true nature of such contracts. In the early stages of the development of this idea there was a strong sentiment against them which found expression in the opinions of judges and in the not always temperate language of distinguished commentators upon the law; but experience has demonstrated their usefulness, and the hostility evinced toward them has by degrees diminished.

This change of opinion appears nowhere more strikingly than in the very valuable work of Thompson on Corporations. In his first edition he places trust certificates beyond the pale

of the law, and declares that they should not be regarded as lawful instruments of commerce, but be treated as "something in the nature of counterfeit money, as securities which have been issued in violation of the law and in contravention of the public right." The second edition (which is not yet completed), in section 893 on voting or pooling trusts, uses the following language: "The fact that the earlier cases were practically unanimous in holding these pooling or voting trusts illegal, and that some law-writers and perhaps some courts, have broadly stated that all such contracts are void, must, in the light of subsequent cases, and the advancement and development of corporation law, be regarded as an application of a principle to all cases which was intended to fit but one. Under the recent and advanced decisions it may be asserted as the present prevailing doctrine that a pooling trust created by a deposit of stock certificates with a trustee for a specified period of time with the authority to vote the same for the benefit of the owners and to the best interests of the corporation, and without an absolute separation of the voting power from the ownership of the stock, by an agreement which is not a restraint of the alienation of property, not in restraint of trade, not against public policy and not a fraud upon other stockholders, is legal. This principle is recognized and the rule stated by one of the foremost writers on corporation law, after collecting and commenting on the leading cases on this subject, as follows: 'The above decisions seem to lead to the conclusion that a deposit of certificates of stock with trustees for a specified period of time, either with or without a transfer of the same to the trustees, is legal, and is not in violation of the usual statute against the alienation of personal property; and is not opposed to public policy as a restraint upon trade; and is not an implied fraud upon stockholders who were allowed to participate; and is not an illegal separation of the voting power from the ownership of stock; provided always that no actual fraud is involved in the transaction. In other words, such a pooling of stock is not

illegal in itself, but like all contracts may be illegal if actual fraud is involved.' "

Upon the subject of voting trusts, Beach on Private Corporations (Ed. 1891), sec. 855, says: "Such an agreement, so lawfully formed at the outset, and for a proper consideration, and for a limited period is binding upon the holders of the trust certificates claiming only under and by virtue of the stock deposited in pursuance thereof, and all the terms of which are, by appropriate statement, made a portion of the trust certificates. Even if one of the motives which led to the creation of the trust was to enable either the trustee or the *cestui que trust* to vote in a given manner at an approaching election, that motive will not invalidate the transfer. Voting trusts then not being illegal upon any principle peculiar to corporation law, can be attacked only on the ground of public policy. What agreements are void as against public policy is very well defined in the law, and contracts which have been held to be so void arrange themselves in five classes: those founded upon corrupt considerations or moral turpitude; those in violation of a public trust; those in restraint of trade; those in restraint of marriage; those to influence persons in authority."

If the agreement under consideration can be held to come within any of the enumerated classes, it must be, that it is in restraint of trade. In what manner and to what extent it restrains trade is not apparent, and we think we are safe in saying, that experience has shown that so far from exercising an injurious influence upon trade, voting trusts have added efficiency, economy and stability to the administration of corporate affairs.

In Machen's Modern Law of Corporations, section 1270, it is said: "Some authorities unquestionably tend to hold that all voting trusts are illegal and void;" (citing for that proposition the cases relied upon by counsel for appellants—among them, *Harvey* v. *Linville Imp. Co.*, 118 N. C. 693, 24 S. E.

489, 54 Am. St. Rep. 749, 32 L. R. A. 265; *White* v. *Thomas Tire Co.*, 52 N. J. Eq. 178, 28 Atl. 75; *Kreissl* v. *Distilling Co.*, 61 N. J. Eq. 5, 47 Atl. 471, and the *Shepaug Voting Trust Cases*, 60 Conn. 553, 24 Atl. 32), "but others," continues the author, "supported, it is submitted, by sounder reasoning, hold that they are lawful if their object is lawful. A voting trust property so called may be illegal as an evasion of a statute which makes void all proxies more than a year old. Of course, if the object of a voting trust is the accomplishment of some illegal end—the restraint of trade, the formation of a monopoly, or the practical merger of two or more corporations in defiance of law—the courts will have no difficulty in holding the trust illegal. So where the sale by a shareholder of his vote, or the issue of a proxy for money or anything of value is deemed illegal, a transfer of shares for valuable consideration which is absolute on its face, but which is really designed merely to confer on the transferees the power to vote on the stock for a period of three years, is also illegal, and the transferee acquires no right to vote. But although stock is put in trust for an illegal purpose, the intended *cestui que trust* is not precluded from compelling the intended trustee to re-transfer the shares. Where the object of the trust is legitimate—for instance, to secure control of the company to its bondholders in order to prevent foreclosure and the utter ruin of all the shareholders—the trust should be upheld and carried out. Some authorities declare that the trust is not effective if supported by no other consideration than the mutual agreement between the shareholders to put their stock into the trust; but no reason is perceived for this conclusion. If the trust is valid, and the trustees have a discretion to determine when the condition of the company is such as to justify the termination of the trust, their discretion in that respect will not be overruled or controlled by the courts in the absence of clear proof that it has been abused."

In a note to the case of *Morel* v. *Hoge*, 16 L. R. A. (N. S.) at page 1140, speaking of voting trusts it is said: "The plan or device now more commonly adopted for the purpose of procuring and continuing the control of the corporation is to procure the stockholders or some portion of them to deposit their stock, with power to the depositary for a definite period to vote the same, the title to the stock itself being usually, though not always, transferred to the depositary upon a trust for such purpose. This form of agreement has proven better adapted to withstand the legal attacks upon it than that which merely contemplates the procuring of irrevocable proxies. It is obvious, of course, that whatever the form of the agreement and however skilfully it may be adapted to avoid legal objections, it will be held invalid if its purpose is to secure an illegitimate or improper advantage, to the detriment of the interests of the corporation and of the other stockholders. The practical question, then, is whether an agreement in this form is *per se* void, as contrary to public policy, or, if not void, whether, in spite of the attempt to make it irrevocable, it may be revoked at the pleasure of the stockholders who have become parties thereto." This is a very precise statement of the question before us, and the author of the note then goes on to give his view as to the present state of the law as applicable to the question. "Probably the prevailing tendency is toward the view that such an agreement is not *per se* void as against public policy; in other words, that the agreement cannot be declared void irrespective of the propriety of the ultimate purpose to be accomplished, merely because it seeks to accomplish that purpose by means of severing the voting power of the stock from the beneficial ownership thereof. The tendency also appears to be toward the view that such agreement, supposing that it is not void, and is by its terms irrevocable, may not be revoked at the pleasure of the stockholders who have become parties thereto."

In *Brightman* v. *Bates*, 175 Mass. 105, 55 N. E. 809, the plaintiff brought suit to recover compensation as the agent for the sale of stock to a syndicate, which was organized for the purpose of obtaining control of a corporation. There was a written agreement by the subscribers, reciting their desire to become members of the syndicate to the end that control of a corporation and advantage to them might be gained, and agreeing to buy the number of shares set opposite their names, and to enter into a pooling contract whereby all the syndicate stock "shall be voted at each annual meeting for a period of not less than three years for such board of directors as shall be named" by a committee of five of the subscribers, with power to the majority of them to fill any vacancy in the committee. The suit was defended upon the ground that the object for which the syndicate was organized was illegal, and that the covenant sued upon was so directly aimed at helping to bring the unlawful arrangement about that it must fall with the other: citing *Gibbs* v. *Consolidated Gas Co.*, 130 U. S. 396, 32 L. Ed. 979, 9 Sup. Ct. 553. The court said: "Without deciding whether, if the covenant was dependent upon the rendering of further services, it was so closely connected with the syndicate agreement as to fall if the latter cannot be sustained, we pass to the question whether the latter agreement is unlawful on its face, bearing in mind that unless it is unlawful on its face it has the advantage of a finding in favor of the plaintiff. In dealing with this question it does not need to be said that combination of common interests is necessary, and constantly is taking place. It is as legitimate for a majority of stockholders to combine as for other people. The fact that they expect 'gain and advantage'—in the words of the syndicate agreement—to accrue to them, does not make the syndicate unlawful. That expectation and intent would have that effect only if the gain was to be at the expense of the corporation, or in some way was intended to work a wrong on the other stockholders. No such

intent appears, and although it is impossible not to view such an arrangement with suspicion, it is also impossible to let suspicion take the place of proof. The only serious ground of objection is the agreement that the stock 'shall be voted at each annual meeting' for three years for a board of directors named by the committee. It is suggested that this was an unlawful attempt by the contracting parties to deprive themselves in advance of their deliberate power and duty as stockholders, and to submit themselves to the dictation of five men who in the future might not be even members of the corporation. Perhaps the notion upon which these suggestions are founded has been pressed somewhat further than would be warranted by more far-seeing views, but we have no occasion to discuss it in this broad form. The question before us is not whether it would be possible to carry out the contract in a way which would have made the contract bad if specified in it, but whether it was impossible to carry out the contract in a way which might lawfully have been specified in advance. We put the question in this form because there is no doubt that the subscribers might actually have done the things stipulated without giving any one a right to complain. That is to say, they might have held their stock and voted by previous understanding according to the advice of the committee, as long as they chose. The question is what they might contract to do; for this is supposed to be a case where a contract to do lawful acts is unlawful. . . . A stockholder has a right to put his shares in trust, whatever his motive. If the trust is an active one he cannot terminate it at will, and the attempt to cut himself off by contract, instead of by the imposition of duties, from ending it, certainly is not enough to poison the covenant with the plaintiff. It might be held that the duty of voting incident to the legal title made such a trust an active one in all cases. . . . If the stockholders want to make their power felt, they must unite. There is no reason why a majority should not agree to keep together."

It is impossible to read the argument of counsel and the
cases and text-writers cited without perceiving that the force
of the attack upon such agreements as that under considera-
tion rests upon the proposition, that the trustees are clothed
only with the naked or dry trust, wholly separated, or "di-
vorced" as it is sometimes described, from the beneficial in-
terest in the stock. If the analysis of the elements of prop-
erty in the ownership of a share of stock, given by Cook on
Corporations (6th ed.), sec. 312, be sound, and we think it can-
not be controverted, then the right to vote the stock is, in
itself, and of itself, a valuable right of property, and such a
trust becomes by virtue of that right an active and not a
passive or dry trust. If this view be correct, it of course an-
swers the other branch of the proposition, and there would
be no separation—certainly no complete separation—or "di-
vorce," such as is contended for, of the ownership of the
stock from the beneficial interest in it.

Passing from definitions, as given by writers upon the
law of corporations, and considering it as a practical sub-
ject, does not common experience prove that the power to
manage and control property is a valuable right; that the
right to manage and control a great corporation, to direct its
policies, involving in many cases the rightful levy and expen-
diture of vast sums of money, is in itself and of itself a right
of great value? Is it not a matter of common knowledge that
the common stock of many corporations which have never
paid a dividend has a considerable market value, growing out
of and dependent upon the right to vote the common stock,
which is the power of control? It may be that the expres-
sion used by Mr. Justice Holmes, of the Supreme Court of
Massachusetts, in *Brightman* v. *Bates, supra,* was in the par-
ticular case an *obiter dictum,* but his observation is none the
less true, that it might with propriety be held "that the duty
of voting incident to the legal title makes such a trust an
active one in all cases." So Mr. Justice Swayze, in *Warren* v.
*Pim,* 66 N. J. Eq. 353, 59 Alt. 773, delivering one of the many

opinions in that case, says: "The right to vote is, I think, a property right and is a valuable one, and I see no reason why the owner of such a right, having the legal title to the stock, has not also a beneficial interest in the stock itself. I think the owner of stock, even though his only beneficial interest is the right to vote thereon, must be held to have a beneficial interest in the stock itself."

Let it be remembered that in this case the trustees were the absolute owners of the stock, and that when they sold the trust certificates they agreed to sell, and the purchasers of those certificates only bought, the right to receive payments equal to the dividends upon the shares of stock, less the expense, if any, incurred by the trustees, and on the 1st of February, 1932, to call for certificates for full paid shares of stock at their par value, and that in the meantime the right to vote remained in the trustees, in order to "promote and to protect the value of the stock and to secure the satisfactory management of the security company."

As we have said, there is no case in this State upon the subject, and upon an examination of the authorities elsewhere we are unable to say that the contract under consideration should be held violative of the public policy of this Commonwealth.

This brings us to a consideration of the only statute which has any bearing upon the subject.

Clause 20 of section 1105-e, Va. Code, 1904, is as follows: "Unless it shall have been otherwise provided in the charter, certificate of incorporation, or in the articles of association, or in an amendment or by-law, each person in whose name stock shall stand upon the books of any corporation at any date fixed by the by-laws as prescribed by section eighteen of this chapter shall be entitled to one vote in person or by proxy for each share of stock appearing in his name on said books."

Clause 21: "The right of any person holding stock in a representative or in a fiduciary capacity, to represent such stock at meetings of any corporation, and to vote thereon, shall be as provided by any agreement heretofore or hereafter made between such person and the beneficial owner concerning such stock, or the right to vote thereon; provided, such agreement or a copy thereof shall have been furnished to the corporation."

Clause 22: "As between the pledgor and the pledgee of capital stock pledged to secure a specific loan with a fixed period or periods of maturity, the right to vote shall be determined as follows: (a) By the written agreement of the pledgor and pledgee. (b) In all other instances the pledgor shall be held to be the owner and entitled to the right to vote."

Clause 23: "Shares of stock of a corporation belonging to it shall not be voted, directly or indirectly."

A consideration of these clauses discloses, (1) that the legislature had under advisement the right of a holder of stock to vote, which is secured to each person in whose name stock stands upon the books of any corporation "at any date fixed by the by-laws as prescribed by section eighteen of this chapter;" (2) the right of any person holding stock in a representative or fiduciary capacity, to represent such stock at meetings of any corporation, and to vote thereon, which it provides "shall be as provided by any agreement heretofore or hereafter made between such persons and the beneficial owner concerning such stock, or the right to vote thereon," as to which the only limitation imposed is, that "such agreement or a copy thereof shall have been furnished to the corporation; and (3) the right to vote, as between the pledgor and the pledgee of capital stock pledged to secure a specific loan with a fixed period or periods of maturity, which it is provided shall be determined (a) by the written agreement of the pledgor and pledgee; and (b) in all other instances the

pledgor shall be held to be the owner and entitled to the right to vote.

The legislature must have known that it was dealing with a subject of the utmost importance, and one with respect to which there was great controversy and contrariety of opinion. It certainly cannot be said that the statutes to which we have referred contain any inhibition upon, or condemnation of, the separation of the ownership of stock from the right to vote upon it. We repeat, that this was the crux of the controversy. It is the point around which the whole contest had been waged before many courts—that it was in and of itself a violation of sound public policy to put the ownership of stock in the hands of one person, and the right to vote upon that stock under the control of another—and yet the legislature of this State, which it is impossible to consider ignorant of such a question, deals with the subject, regulates the right to vote upon stock under many varying aspects and conditions of ownership and representation, without a hint or suggestion that a voting trust is in violation of public policy, when if it had been of that opinion a line upon the subject would have put the whole controversy at rest. So far from condemning a voting trust, it may well be argued that clause 21 in fact approved them, at least in so far as it recognizes as lawful that which constitutes the principal ground upon which such trusts have been elsewhere disapproved, for it declares that the right of a person holding stock in a fiduciary capacity to represent such stock at the meetings of any corporation and to vote thereon shall be as provided by any agreement heretofore or hereafter made between such person and the beneficial owner concerning such stock, or the right to vote thereon; the only condition being that such an agreement or copy thereof shall have been furnished to the corporation.

As we have already said, the record in this case does not disclose any element of oppression, immorality, fraud or bad

faith as the actuating motive underlying the "February Agreement." There is no averment or proof of a purpose to do any act beyond the limits of the corporate authority of the security company, "or to secure an illegitimate or improper advantage to the detriment of the interests of the corporation and of the other stockholders." As was said in *Brightman* v. *Bates*, *supra*, the question before us is not whether or not it would be possible to carry out the contract in a way which would have made the contract bad if specified in it, but whether it was impossible to carry out the contract in a way which might lawfully have been specified in advance. If in the future the trustees are guilty of a breach of trust, or do any unlawful act to the prejudice of the interests of the corporation or its stockholders, a court of equity is always open to give such relief as the nature of the case may require.

The decree of the chancery court must be affirmed.

*Affirmed.*