## Richmond

### COLONIAL COAL & COKE CO. AND OTHERS V. REAM AND OTHERS.

March 13, 1913.

1. CONTRACTS—*Sale of Stocks—Specific Performance—Voting Trusts—Prior Pledge of Stock.*—Where an insolvent stockholder, long prior to the formation of a voting trust syndicate to which he is a party, has delivered his stock in pledge to a creditor to secure a loan equal in amount to the par value of the stock, and subsequently, in default of payment of the loan, the stock is sold, pursuant to the terms of the pledge, the purchaser at such sale (or a subsequent purchaser) who has paid the full market value of the stock, whether with or without notice of the voting trust, is not amenable to the provisions of the trust agreement, but takes a full equitable title to the stock and may, on a bill filed for the purpose, compel the company which issued the stock to pass to him the legal title thereto by transferring the shares to him on its books.

Appeal from a decree of the Circuit Court of Wise county. Decree for the complainants. Defendants appeal.

*Affirmed.*

The opinion states the case.

*Wm. A. Glasgow* and *Bullitt & Chalkley,* for the appellants.

*Vicars & Peery,* for the appellees.

WHITTLE, J., delivered the opinion of the court.

The controlling questions presented by this record involve (1) the right of the appellee, E. K. Ream, who was

plaintiff in the original bill, to have transferred to him on the books of the Colonial Coal and Coke Company three hundred shares of the capital stock of that company of the par value of $100 per share, formerly owned by the appellee, J. A. Esser, and to which Ream asserts title by purchase under a sale for the benefit of creditors; and (2) the right of the appellants, H. A. Butler, W. O. Kent and D. B. Wentz, who were plaintiffs in the cross-bill filed in the cause, to specific execution of a voting trust agreement executed April 18, 1910, between themselves and J. A. Esser, by virtue of which agreement they assert the right, as against Ream, to acquire and control the stock in controversy. We shall address ourselves to the consideration of these two propositions in their legal aspects in the light of our conclusions of fact drawn from the evidence, and shall not enter into the wide field of controversy with respect to the relative merits of the differences between opposing stockholders of the Colonial Coal and Coke Company (some of whom are not even parties to the litigation) in their efforts to acquire control of the company, to which much of the evidence and argument have been directed.

On February 15 and August 30, 1909, J. A. Esser borrowed $30,000 from Rogers, Brown & Co., of Cincinnati, Ohio, for which loan he made two collateral notes for $15,000, with three hundred shares of the capital stock of the Colonial Coal and Coke Company as security. These notes were renewed from time to time, upon the same security, down to and including February 15 and July 5, 1910. On April 18, 1910, J. A. Esser, H. A. Butler, W. C. Kent and D. B. Wentz (all of whom were stockholders in the Colonial Coal and Coke Company) entered into a voting trust agreement, to the effect that until the expiration of the company's lease in December, 1914, none of the contracting parties would sell his stock without first giving the other parties notice of his desire and purpose to sell the same,

and to allow such other parties opportunity to buy the stock at the best price offered by anyone else, or to sell his stock to any person not a party to the agreement, unless such person would consent to buy all the stock owned by the parties to the agreement who desired to sell at the price offered. They appointed J. A. Esser, H. A. Butler, W. C. Kent and D. B. Wentz their agents and attorneys in fact to vote the stock of each member of the voting trust at all meetings of the stockholders from the date of the agreement until the expiration of the lease, which powers of attorney were declared to be irrevocable.

Throughout the time covered by the transactions alluded to, J. A. Esser was insolvent, and he never regained title to, or possession or control, of the stock which is the subject of this litigation. On July 29, 1910, Esser was largely indebted to the First National Bank of Norton, Virginia, and to secure that indebtedness he assigned to J. H. Allport, trustee for the bank, the three hundred shares of stock, subject to the prior assignment thereof to Rogers, Brown & Co. The deed of trust stipulated that Allport should use his best efforts to renew the loan to Rogers, Brown & Co., so as to afford Esser opportunity to discharge the debt and prevent the sacrifice of the stock at a forced sale. The deed also provided that upon failure of Esser, within six months from August 1, 1910, to pay his indebtedness to the bank, the trustee, upon written request of the creditor, should sell the stock at public auction for cash, after thirty days' advertisement of the sale.

On August 31, 1910, Allport, on behalf of the bank, purchased from Rogers, Brown & Co. the Esser notes, including the stock held by them as collateral. On February 4, 1911, he addressed a letter to Esser, notifying him of his purchase of the notes and securities from Rogers, Brown & Co., and informing him that unless he could pay off his indebtedness by February 11th he (Allport) would sell

the stock in pursuance of their conversation on February 2d, and in accordance with the terms of the collateral notes purchased by him for the bank from Rogers, Brown & Co. Esser replied to Allport's letter on February 6, 1911, saying that he was unable to take up the loans at that time, and, therefore, assented to a sale of the stock, under the collateral agreement given to Rogers, Brown & Co., and in accordance with their conversation of February 2d. The collateral agreement empowered Rogers, Brown & Co. and their assigns to sell and assign and deliver the certificates of stock at public or private sale at their option on non-payment of the indebtedness for which they were pledged.

On March 11, 1911, the appellants, Wentz, Kent and Butler, being advised of Allport's purchase, submitted to him an offer in writing of $33,000 for the stock. This offer he agreed to refer to the board of directors of the bank, but he subsequently sold the stock to the appellee, E. K. Ream, for $37,500, or at an advance of $4,500 over the appellants' bid.

From a decree sustaining Ream's purchase and granting the prayer of his bill, this appeal was allowed.

The appellants attach importance to the circumstance that E. K. Ream had notice of the voting trust agreement before he completed his purchase of the stock by paying the purchase price, and they moreover rely upon the decision of this court in *Carnegie Trust Company and Others* v. *Security Life Insurance Co. of America and Others,* 111 Va. 1, 68 S. E. 412, 31 L. R. A. (N. S.) 1186, as authority to warrant the specific execution of the voting trust agreement against Ream. The distinction between the two cases is obvious. The case relied on was a suit in equity by the Carnegie Trust Company and others (claiming to be the equitable holders and owners of a majority of voting trust certificates and capital stock of the Security Life Insurance Company) against the last-named company and trus-

tees of a voting trust (entered into for the purpose of controlling and managing the affairs of the company for twenty-five years) to set aside the voting trust agreement as contrary to public policy, without consideration, fraudulent and void. This court was, however, of opinion that in such case, "in the absence of any element of oppression, immorality, fraud, or bad faith actuating the agreement, or of a purpose to do any act beyond the limits of the corporate authority of the company, or to secure an illegitimate or improper advantage to the detriment of the interest of the company and of the other stockholders, the voting trust agreement * * * was not contrary to the public policy of the State." The court consequently affirmed the decree of the Chancery Court of the city of Richmond granting the relief prayed for in plaintiffs' bill. But it will be observed that that suit was between stockholders and in no way affected the rights of existing creditors or strangers to the agreement. The controversy was among stockholders and only involved the control and management of the business policies of the company. It may be that by that decision the voting trust agreement in this case would be upheld in a controversy between stockholders and parties to the compact.

But it is inconceivable that where an insolvent stockholder had long prior to the voting trust agreement delivered his stock in pledge to a creditor to secure a loan equal in amount to the par value of the stock; and where, in default of payment, the creditor had sold the stock in pursuance of the terms of the contract of hypothecation, that a purchaser at such sale (or a subsequent purchaser) who had paid the full market value of the stock, whether with or without notice of the voting trust, could be held amenable to its provisions, and compelled to turn over his purchase to the voting trust syndicate.

It would be, indeed, a mischievous doctrine to establish

that an insolvent debtor, who had borrowed money wholly on the faith of his stock, which he had contemporaneously delivered to the creditor, as collateral security for the loan, with full power of sale, could by a subsequent arrangement with business associates place an embargo upon the creditor's power of sale of the security under his contract. The power to sell necessarily comprehends the correlative power to buy; and appellants recognized that principle when they offered to purchase the stock from Allport for $33,000. If they could purchase the stock in contravention of the terms of the voting trust compact, why could not Ream, who was not even a party thereto?

In 2 Cook on Corporations, sec. 622-c, it is said: "An agreement, however, between the stockholders of a corporation that one of them will not sell, assign or dispose of his stock without first having given the other parties to the agreement an opportunity to purchase, does not disable a party from transferring a legal title to the stock without the consent of the other parties and in violation of the agreement, and this, although the transferee was cognizant of the agreement at the time of the transfer. It is a breach of contract, but the remedy is usually at law for damages. A corporation cannot refuse to transfer stock on the ground that the vendor had agreed with others not to sell his stock. Such also is the rule as to a contract that a stockholder, before selling his stock to others, shall first offer the stock to the corporation itself. A personal agreement between the incorporators, promoters and proposed subscribers to the stock of a proposed corporation, by which agreement the corporation is to have the first right to buy the stock of anyone who wishes to sell, does not prevent a sale by a stockholder without offering the stock to the corporation. Hence, the corporation cannot refuse to transfer the stock. Specific performance of such a contract, however, will be granted by the courts when

there are special reasons therefor and performance is possible." See also *Id.* sec. 622-f.

There is nothing in this case to take it out of the general rule, or to entitle appellants to specific performance of the voting trust agreement against the appellee, Reams, were specific performance otherwise possible. By his purchase Ream became the complete equitable owner of the stock, and the Colonial Coal and Coke Company refusing to pass the legal title by transferring the shares to him on the books, as provided by its charter, he had the right to invoke the aid of a court of equity to compel the performance of that duty.

For the foregoing reasons the decree appealed from must be affirmed.

*Affirmed.*